BUILDERS SERVICE CORPORATION, INC., ET AL. *v.* PLANNING AND ZONING COMMISSION OF THE TOWN OF EAST HAMPTON ET AL.
(13205)

HEALEY, SHEA, GLASS, COVELLO and HULL, Js.

Argued March 10—decision released July 12, 1988

*Timothy S. Hollister,* with whom were *Philip D. Tegeler* and, on the brief, *Dwight H. Merriam,* for the appellants (plaintiffs).

*John L. Boccalatte,* for the appellees (defendants).

*Terry J. Tondro* and *Philip D. Tegeler* filed a brief for the Connecticut Civil Liberties Union Foundation et al. as amici curiae.

ARTHUR H. HEALEY, J. In this case, the plaintiffs are Builders Service Corporation, Inc. (Builders), and Homebuilders Association of Connecticut, Inc. (Homebuilders), each a nonstock Connecticut corporation, and the defendants are the town of East Hampton (town) and the East Hampton planning and zoning commission (commission).[1] This action was originally instituted by Edward A. Markham[2] and Homebuilders. At that time Markham owned a building lot consisting of 3.57 acres (homesite) in the town of East Hampton. After the institution of the action, title to this lot was transferred to Builders and the latter was substituted for Markham as a party plaintiff.

Builders proposes to construct a single-family residential home on the homesite. This homesite is situated in the "AA-1" zone, a residential zone in which

[1] The defendant town of East Hampton has established the defendant East Hampton planning and zoning commission as the town's zoning authority by adopting the provisions of chapter 124 of the General Statutes.

[2] Prior to the purchase of the homesite by Builders, the commission had denied Markham's request to allow him to build a house with a floor area

the zoning regulations allow single-family detached homes on interior lots of 90,000 square feet or more. Section 5.15 of the East Hampton zoning regulations, which is entitled "Minimum Floor Area of Dwelling Units,"[3] provides in part: "No building shall be erected, enlarged, altered or rebuilt unless it provides the following minimum floor area for each dwelling unit.

"1. Single-family dwellings having three bedrooms or less:

|  | AA-1, AA-2 Zones | Other Zones |
|---|---|---|
| One story with base-ment or cellar | 1,300 [square feet]" | 1,100 |

The home that Builders proposes to erect on the homesite through the services of a builder has a floor area,[4] as defined in the regulations, of 1026 square feet.

of less than the minimum required by the zoning regulations. Builders contends that it would clearly have been futile for it to seek relief from the zoning enforcement officer or the zoning board of appeals because the regulations clearly prohibit the home that it seeks to build.

[3] Section 5.15 of the East Hampton zoning regulations provides: "No building shall be erected, enlarged, altered or rebuilt unless it provides the following minimum floor area for each dwelling unit.

"1. Single-family dwellings having three bedrooms or less:

|  | AA-1, AA-2 Zones | Other Zones |
|---|---|---|
| One story with basement or cellar | 1,300 | 1,100 |
| One story without basement or cellar | 1,450 | 1,250 |
| One and one-half story | | |
| ground floor | 864 | 864 |
| second floor | 425 | 425 |
| Split level | 1,300 | 1,100 |
| Two story, with not more than half the required floor area on the first floor | 1,850 | 1,600 |
| Earth sheltered housing | 1,300 | 1,100 |

"2. Multiple Family Dwellings: Multi-family dwellings shall have a minimum floor area of 650 square feet per dwelling unit containing one bedroom. A dwelling unit containing more than one bedroom shall provide 150 square feet for each additional bedroom. Stairways, public halls, rooms containing space and/or water heating equipment, garages, open or closed outside vestibules or porches or verandas, and unfinished basement space shall not be counted in computing minimum floor space."

[4] Section 3.6 (F) (4) of the East Hampton zoning regulations defines "floor area" as follows: "Floor Area: The sum of the gross horizontal areas of

In this action in the trial court, the plaintiffs sought a declaratory judgment determining that (1) the zoning regulations that require minimum floor area requirements for residential dwelling units without reference to occupancy are ultra vires as violating the zoning enabling act, i.e., General Statutes § 8-2,[5] and (2) § 5.15 of the zoning regulations violates § 8-2, the fourteenth amendment to the United States constitution, article first, §§ 8 and 10, of the Connecticut constitution and the commission's own regulations. They also asked for a permanent injunction prohibiting the

the several floors of a building, measured from the exterior faces of exterior walls which has a minimum head room of 7-1/3 feet when measured vertically upward from a finished floor; but in the area next below the roof such space shall be counted only if it is connected with floor below by a permanent inside stairway. Attached structures such as, but not limited to, open or enclosed porches, verandas, garages, and basement and cellar areas shall not be included, except in the case of Earth Sheltered Housing as defined in Section 3.5.1 and properly insulated attached greenhouses used for solar heating, providing that such greenhouses do not make up greater than 30% of the floor area requirements."

[5] General Statutes § 8-2, entitled "Regulations," provides: "The zoning commission of each city, town or borough is authorized to regulate, within the limits of such municipality, the height, number of stories and size of buildings and other structures; the percentage of the area of the lot that may be occupied; the size of yards, courts and other open spaces; the density of population and the location and use of buildings, structures and land for trade, industry, residence or other purposes, and the height, size and location of advertising signs and billboards. Such zoning commission may divide the municipality into districts of such number, shape and area as may be best suited to carry out the purposes of this chapter; and, within such districts, it may regulate the erection, construction, reconstruction, alteration or use of buildings or structures and the use of land. All such regulations shall be uniform for each class or kind of buildings, structures or use of land throughout each district, but the regulations in one district may differ from those in another district, and may provide that certain classes or kinds of buildings, structures or uses of land are permitted only after obtaining a special permit or special exception from a zoning commission, planning commission, combined planning and zoning commission or zoning board of appeals, whichever commission or board the regulations may, notwithstanding any special act to the contrary, designate, subject to standards set forth in the regulations and to conditions necessary to protect the public health, safety, convenience and property values. Such regu-

defendants, or any of its agents, from enforcing § 5.15 of the zoning regulations. The defendants filed a special defense to the plaintiffs' amended complaint, alleging that "the Defendant Town of East Hampton has and has adequately provided for affordable housing."

The case was tried to the court, *Hon. Harry W. Edelberg, J.,* state trial referee, who found for the defendants. An articulation of the trial court's memorandum of decision was sought by the plaintiffs but was denied. Fairly viewed, it can be said that the memo-

lations shall be made in accordance with a comprehensive plan and shall be designed to lessen congestion in the streets; to secure safety from fire, panic, flood and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population and to facilitate the adequate provision for transportation, water, sewerage, schools, parks and other public requirements. Such regulations shall be made with reasonable consideration as to the character of the district and its peculiar suitability for particular uses and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality. Such regulations shall also encourage the development of housing opportunities for all citizens of the municipality consistent with soil types, terrain and infrastructure capacity. Zoning regulations may be made with reasonable consideration for the protection of historic factors and shall be made with reasonable consideration for the protection of existing and potential public surface and ground drinking water supplies. On and after July 1, 1985, the regulations shall provide that proper provision be made for soil erosion and sediment control pursuant to section 22a-329. Such regulations may also encourage energy-efficient patterns of development, the use of solar and other renewable forms of energy, and energy conservation. The regulations may also provide for incentives for developers who use passive solar energy techniques, as defined in subsection (b) of section 8-25, in planning a residential subdivision development. The incentives may include, but not be limited to, cluster development, higher density development and performance standards for roads, sidewalks and underground facilities in the subdivision. Such regulations shall not prohibit the continuance of any nonconforming use, building or structure existing at the time of the adoption of such regulations. Any city, town or borough which adopts the provisions of this chapter may, by vote of its legislative body, exempt municipal property from the regulations prescribed by the zoning commission of such city, town or borough; but unless it is so voted municipal property shall be subject to such regulations."

randum of decision concluded that: the regulation at issue was not "ultra vires"; the plaintiffs had failed to prove that "regulation by zoning authorities of minimum floor area without reference to occupancy does not have a rational basis in conserving values of buildings"; zoning commissions may be concerned about excessive intrusion into privacy by enforcing an occupancy provision, yet the establishment of varying minima in different residential zones as in § 5.15 of the zoning regulations has no rational basis; a zoning regulation is not to be held invalid, given the broad powers of local enacting authorities, unless its invalidity is established beyond a reasonable doubt; and the regulation at issue was constitutional; and the town had, "through its zoning and other activities, provided for affordable housing." In discussing the subject of ultra vires, the court opined that the standards set by this court "for a declaration of invalidity of regulations based on a claim of 'ultra vires' are almost insurmountable." There is no indication whether the holding of constitutionality is based on either the federal or state constitution or both. In addition, an examination of the briefs filed after the trial demonstrates that the trial court did not rule on all the claims of law made, especially certain of those made by the plaintiffs. These claims include that the regulations at issue do not promote the general welfare, that housing codes and not zoning regulations are the proper place for floor area requirements and that the real purpose of the town's minimum floor area requirement is to exclude from certain residential zones those who cannot afford a home of 1300 square feet, keeping in mind that the zoning enabling act does not allow zoning to be used for such a purpose.

On appeal, the plaintiffs essentially claim that the trial court erred in holding that: (1) the town's minimum floor area requirement does not violate the zon-

ing enabling act in General Statutes § 8-2; and (2) this floor area requirement did not violate the United States and Connecticut constitutions.

## I

The plaintiffs' first claim of error has a number of subsets. Initially, the plaintiffs claim that the defendants had no authority under the enabling act in General Statutes § 8-2 to enact any minimum floor area requirement ordinances. Another claim is that a zoning regulation, to be valid, must "substantially advance" one or more of the purposes set forth in the zoning enabling act in § 8-2. This, in turn, the plaintiffs contend, implicates the "traditional" standard of review, which, the plaintiffs argue, is heightened, at least in the constitutional area, by the recent United States Supreme Court decision in *Nollan* v. *California Coastal Commission,* 483 U.S. 825, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987). The plaintiffs maintain that *Nollan* requires that for a zoning regulation to be valid, it must "substantially advance" a legitimate purpose of zoning. In maintaining that this regulation does not "substantially advance" any legitimate purposes of zoning set out in the zoning enabling act, the plaintiffs next argue that it does not advance health and safety, the general welfare, property values or prevention of overcrowding, that housing codes are the only proper place for floor area requirements, and that the "real purpose of the regulation is to exclude from certain residential zones those who cannot afford a home of 1300 square feet." Error is also claimed in the trial court's justification of the regulation on the ground that it not only conserves property values but also because the town of East Hampton "has made efforts in other areas of town to promote affordable housing."

## A

At the outset, we address the plaintiffs' claim that § 5.15 of the zoning regulations represents an "ultra

vires"[6] act in that its enactment was not within the authority of the zoning enabling act in General Statutes § 8-2. We cannot accept this claim.

In order for the challenged regulation to be found "ultra vires," the commission, in enacting the regulation, must have acted beyond the powers conferred upon it by law. The town established the commission as the town's zoning authority by adopting the provisions of chapter 124 of the General Statutes. See General Statutes § 8-1; *Puskarz* v. *Zoning Board of Appeals,* 155 Conn. 360, 364–65, 232 A.2d 109 (1967). Chapter 124 includes § 8-2. Zoning is an exercise of the police power. "Zoning regulates the use of land irrespective of who may be the owner of such land at any given time and is defined 'as a general plan to control and direct the use and development of property in a municipality or a large part of it by dividing it into districts according to the present and potential use of the properties.' *State ex rel. Spiros* v. *Payne,* 131 Conn. 647, 652, 41 A.2d 908 [1945] . . . ." *Karp* v. *Zoning Board,* 156 Conn. 287, 297–98, 240 A.2d 845 (1968). " 'As a creature of the state, the . . . [town . . . whether acting itself or through its planning commission,] can exercise only such powers as are expressly granted to it, or such powers as are necessary to enable it to discharge the duties and carry into effect the objects and purposes of its creation.' *Baker* v. *Norwalk,* 152 Conn. 312, 314, 206 A.2d 428 [1965], and cases cited therein;

---

[6] The plaintiffs appear to have another claim characterized as "ultra vires" in which they argue that the regulation attacked is "ultra vires" under the zoning enabling act in that the commission used its zoning powers in enacting this regulation to "segregat[e] landowners [in East Hampton] on the basis of income." Thus, they contend, the challenged regulation gives legislative sanction to a division of residents in the town that serves to exclude lower and moderate income persons from certain residential districts because of the high minimum floor area requirements for single-family houses under the regulations. We discuss this argument, which is not analytically characterized as "ultra vires" below, after we address the essentially "ultra vires" claim of the plaintiffs.

*Bredice* v. *Norwalk,* 152 Conn. 287, 292, 206 A.2d 433 [1964]; *State ex rel. Sloane* v. *Reidy,* 152 Conn. 419, 423, 209 A.2d 674 [1965]. In other words, in order to determine whether the regulation in question was within the authority of the commission to enact, we do not search for a statutory prohibition against such an enactment; rather, we must search for statutory authority for the enactment." *Avonside, Inc.* v. *Zoning & Planning Commission,* 153 Conn. 232, 236, 215 A.2d 409 (1965); *Blue Sky Bar, Inc.* v. *Stratford,* 203 Conn. 14, 19, 523 A.2d 467 (1987). "If the legislation is [a zoning] ordinance, it must comply with, and serve the purpose of the statute under which the sanction is claimed for it." *Clark* v. *Town Council,* 145 Conn. 476, 482–83, 144 A.2d 327 (1958); *Fairlawns Cemetery Assn., Inc.* v. *Zoning Commission,* 138 Conn. 434, 440, 86 A.2d 74 (1952). A local zoning commission is "subject to the limitations prescribed by law [and] [t]he power to zone [is] not absolute but [is] conditioned upon an adherence to the statutory purposes to be served." (Emphasis added.) *State* v. *Huntington,* 145 Conn. 394, 398, 143 A.2d 444 (1958); *Damick* v. *Planning & Zoning Commission,* 158 Conn. 78, 83, 256 A.2d 428 (1969).

The plaintiffs initially claim that there exists no authority under the enabling act for the commission to enact a regulation prescribing minimum floor area requirements at all. Implicated in this claim is the assertion that such a regulation properly belongs in housing codes as opposed to zoning regulations. In this "ultra vires" posture, the plaintiffs maintain that minimum floor area regulation is inconsistent with the purpose of zoning that, they argue, is not only to separate uses geographically into zones within a municipality, but also to ensure that uses on individual lots within those zones are made compatible with each other.

This argument, however, fails to accord a fair and reasonable meaning to the enabling act in § 8-2, par-

ticularly that portion which provides that a local "zoning commission . . . is authorized to regulate . . . the . . . *size* of buildings . . . ." (Emphasis added.) In that regard, "[i]t is an elementary rule of construction that statutes should be considered as a whole, with a view toward reconciling their separate parts in order to render a reasonable overall interpretation; the application, moreover, of common sense to the statutory language is not to be excluded. . . . We must avoid a consequence which fails to attain a rational and sensible result which bears most directly on the object which the legislature sought to obtain." *LaProvidenza* v. *State Employees' Retirement Commission,* 178 Conn. 23, 29, 420 A.2d 905 (1979). A statute, of course, should not be interpreted to thwart its purpose. *Kron* v. *Thelen,* 178 Conn. 189, 192, 423 A.2d 857 (1979). Moreover, in construing a statute, no word should be treated as superfluous or insignificant. *Green* v. *Freedom of Information Commission,* 178 Conn. 700, 703, 425 A.2d 122 (1979). "Where a statute or regulation does not define a term, it is appropriate to focus upon its common understanding as expressed in the law and upon its dictionary meaning." *Ziperstein* v. *Tax Commissioner,* 178 Conn. 493, 500, 423 A.2d 129 (1979). "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language. . . ." General Statutes § 1-1 (a).

The noun "size" means "physical magnitude, extent, or bulk: the actual, characteristic, normal or relative proportion of a thing." Webster's Third New International Dictionary. Webster indicates that it is synonymous with "dimensions, area, extent, magnitude [and] volume." Id. "Size" is not a term of art in this case. It, "like any other word, 'may vary greatly in color and content according to the circumstances and the time in which it is used.'" *In re Fidelity Mortgage Investors,* 690 F.2d 35, 38 (2d Cir. 1982), cert. denied sub

nom. *Lifetime Communities, Inc.* v. *Administrative Office of the United States Courts*, 462 U.S. 1106, 103 S. Ct. 2453, 77 L. Ed. 2d 1333 (1983). Its very definition implies an allowance for some degree of difference depending on the "thing" involved. It suggests, as well, a sense of compatability with the context of its referent as that may be. Its flavor of relativity, depending on the circumstances of its usage, implies some leeway within permissible limits. The term "size" in the zoning enabling act is apt because "size" itself is not a static concept just as zoning itself is also not a static concept. Given the social and economic problems dealt with by zoning legislation, this term merits a practical construction where overrefined inquiry into the meaning of such a common word could well ill serve the legislative purpose. According the common meaning, where the contrary is not indicated, advances legislative intent, thus underscoring Justice Frankfurter's concern when he said: "[L]egislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him." *Addison* v. *Holly Hill Fruit Products, Inc.*, 322 U.S. 607, 618, 64 S. Ct. 1215, 88 L. Ed. 1488 (1944). "The word 'regulate' implies, when used in legislation, the bringing under the control of constituted authorities the subject to be regulated. Webster, New International Dictionary (2d Ed.). It infers limitations." *Hartland* v. *Jensen's, Inc.*, 146 Conn. 697, 702, 155 A.2d 754 (1959); see *Blue Sky Bar, Inc.* v. *Stratford*, supra, 20.

We conclude that because § 8-2 authorizes zoning commissions "to regulate . . . the . . . *size* of buildings" (emphasis added) it authorizes them to regulate the size of the floor areas of such buildings by enacting regulations prescribing minimum floor area requirements. Such an interpretation does not involve

inserting a word that the legislature did not include but rather advancing the legislative intent by interpreting the meaning of what it did say. See, e.g., *Colli* v. *Real Estate Commission,* 169 Conn. 445, 452, 364 A.2d 167 (1975). Our conclusion is that § 8-2 authorizes the enactment of minimum floor regulations not only from the "size of buildings" language but also because this conclusion is reasonable in the light of the entire statutory purpose of § 8-2 in the statutory zoning scheme. Therefore, the commission's authority to enact a regulation prescribing minimum floor area requirements for a single-family house is not "ultra vires," i.e., beyond its power under the zoning enabling act in General Statutes § 8-2.

## B

The plaintiffs' next claim is that the minimum floor area regulation was "not rationally adapted to the promotion of public health, safety, convenience or welfare." Although the trial court acknowledged that the plaintiffs, in support of their allegations, had presented experts[7] who were "outstanding and highly respected in their respective fields," it specifically rejected, as was its prerogative, as "unconvincing" the testimony of one of these experts, John Rowlson, a real estate appraiser, who testified on, inter alia, the influence of floor area requirements on the conservation of value of buildings. In doing so, the trial court said that Rowlson used the "multiple regression analysis"[8] method

---

[7] These experts included Eric Mood, a nationally recognized expert on public health matters, John Rowlson, a real estate appraiser with about thirty years experience, and Charles Vidich, a municipal and regional planner with such experience in a number of Connecticut municipalities.

[8] Rowlson, a member of the Masters Appraisal Institute, testified that "multiple regression analysis" was a commonly used technique in real estate appraising. He used this technique to demonstrate the relationship of floor area to value, opining that the floor area of a home, in and of itself, had no discernible effect on the fair market value of the home or any adverse effect on the value of abutting or neighboring homes. His testimony included

to establish his expert opinion on the subject. That analysis, however, the trial court said, "was based on imponderables and many variables."

Although the trial court's ultimate determination was that the plaintiffs "failed to carry [their] burden of proof that regulation by zoning authorities of minimum floor area without reference to occupancy does not have a rational basis in conserving the values of buildings," it did, before discussing that, reach a somewhat enigmatic conclusion on the question of whether the nonoccupancy based minimum floor area requirement in § 5.15 promoted public health. The enabling statute provides that regulations "shall be designed . . . to promote [public] health and the general welfare . . . ." General Statutes § 8-2. Here, the trial court found, after weighing the plaintiffs' expert testimony, "that regulation of floor area without reference to occupancy had no rational basis for promoting the public health." It acknowledged that the commission had established

his efforts to confirm this observation by its application to his study of a number of randomly selected home sales in East Hampton.

Rowlson's testimony elucidated the multiple regression analysis by saying that it included the consideration of five independent variables, including house size, land area, date of sale, and age of the house, which were used in the formula employed in this analysis in order to ascertain the dependent variable sought, i.e., market value. After putting the information gleaned from the independent variables into a computer and obtaining the dependent variable of value, he maintained that further computer operations that he discussed enabled him to determine the reliability of this determination.

"Multiple regression [analysis] is a statistical technique designed to estimate the effect of several independent variables on a single dependent variable. . . . The most important issue in a regression analysis is what factors should be included as the independent variables. It is important to include all variables that significantly influence the dependent variable." *E.E.O.C.* v. *Sears, Roebuck & Co.*, 628 F. Sup. 1264, 1287 (N.D. Ill. 1986). There is little question that "[c]ourts . . . must carefully evaluate all the assumptions and data underlying the statistical analysis to determine whether they are sufficiently related to reality to provide any useful information to the court." Id., 1286.

"varying minima" for floor area requirements in different residential zones in § 5.15 of the zoning regulations and it said that such "varying minima" had no rational basis. It then explicitly stated that "[i]f the only basis for sustaining floor area regulations was the promotion of public health, the regulations *in [their] present form* might be invalid; however, there are other bases on which the validity of the regulations can be sustained." (Emphasis in original.) We note that the trial court uses the word "might"; this is hardly a firm conclusion. Even in a judicial opinion, "might" does not mean "must." *N.L.R.B.* v. *Lundy Manufacturing Corporation,* 316 F.2d 920, 923 (2d Cir. 1963). Given this equivocation, we, nevertheless, address this "conclusion" briefly at this point. This equivocal conclusion fairly amounts, however, to stating that § 5.15 of the zoning regulations, "in its present form," has no rational basis insofar as the "promotion of public health" is concerned. This is the only reasonable conclusion in view of the testimony of the plaintiffs' public health expert, Eric Mood, whose credentials and credibility are not attacked in the trial court's memorandum of decision. Mood opined that this "particular zoning regulation," which does not address occupancy, was "completely irrelevant" to protect the physical[9] health of a person occupying such a regulated structure. Mood used the standards from the 1986 revision of the recommended minimum standards for healthful housing of the American Public Health Association. He said that the minimum under those standards "for two persons occupancy would be 250 square feet and for

---

[9] Later in his testimony, Mood, who has served as the chairman of the Committee on Housing and Health of the American Public Health Association on a number of occasions, said that his definition of "health" did not exclude mental health. In doing so, he testified that insofar as housing studies are concerned, there has not been any opportunity and nobody has been able to conduct any valid studies and show the effects of housing on mental health.

a three person occupancy would be 350 square feet."[10] We note that Mood said that these standards excluded space that was involved in "bathrooms, corridors and things of that nature." It is apparent why the trial court was properly concerned about the "varying minima" of minimum floor areas under § 5.15 of the zoning regulations in the various residential districts of the town for single-family houses. The rational basis for such differences, wholly unrelated to occupancy, clearly caused it to question the regulation *"in its present form"* insofar as promoting public health.[11] We conclude that § 8-2 fairly contemplates that a municipality that has adopted chapter 124 of the General Statutes should include in any minimum floor area requirement an occupancy based component if it is to be justified as promoting public health. We agree with the trial court that varying minimum floor area requirements, as in § 5.15 of the challenged zoning regulations, without more, are illogical insofar as the promotion of public health is concerned.

---

[10] At that time, Mood was asked the following question and gave the following answer:

"Q. And with regard to floor area, what are those recommended minimum standards in that report?

"A. The current ones—there are two sets of floor standards, one of them as it relates to sleeping space, and in a sleeping space is the fact that there will be at least seventy feet of floor space for occupants and if there is more than one occupant, there will be 100 square feet for two occupants and then for each additional occupant will be 50 additional square feet. Also, is the fact that the ceiling height will be at least seven feet high. Then there is [a] standard as it relates to the total living space which excludes space that is involved [in] bathrooms, corridors and things of that nature; that standard will be 150 feet for the first occupant and 100 square feet for each additional occupant. So therefore, for two persons occupancy would be 250 square feet and for a three person occupancy 350 square feet."

[11] Mood also testified that housing codes, and not zoning codes, are the proper place for minimum floor area requirements. That is not referred to in the trial court's memorandum, but an examination of that memorandum suggests that the trial court did not appear to agree. This is particularly true because of its position on the "varying minimum" issue that impliedly rejects this claim of the plaintiff.

While the trial court rendered this equivocal conclusion that the regulation in its present form "might" be invalid if the only basis for sustaining it was the promotion of health, it said that there were "other bases" upon which its validity could be sustained. A fair reading of the memorandum of decision discloses two other bases: (1) that the plaintiffs failed to carry their burden of proof that "regulation by zoning authorities of minimum floor area without reference to occupancy does not have a rational basis in conserving values of buildings"; and (2) that "the town has, through its zoning and other activities, provided for affordable housing."

We turn first to the basis that the plaintiffs failed to sustain their burden of proof on the issue of conserving the value of buildings. Having already determined that the enabling act authorizes the commission to enact minimum floor area regulations, we must determine whether that power includes the authority to do so without any reference to per person occupancy. If it does, the ultimate result in exercising that authority must still promote the public health or the general welfare as well as conserve the value of buildings. This is so because the enabling act requires that regulations shall be made "with *a* view to conserving the value of buildings . . . . " (Emphasis added.) General Statutes § 8-2. The use of the indefinite article "a" before "view" connotes something that is "looked toward or kept in sight." Webster's Third New International Dictionary. In statutory construction, unlike the definite article "the," which particularizes the words it precedes and is a word of limitation, the indefinite article "a" has an "indefinite or generalizing force." *Brooks* v. *Zabka,* 168 Colo. 265, 269, 450 P.2d 683 (1969). This is also true because a zoning regulation, to be valid, "must serve some phase of the public health, safety, convenience or welfare in a reasonable, impartial and considerate way." *Clark* v. *Town Council,* supra.

"Zoning legislation has been upheld with substantial uniformity as a legitimate subject for the exercise of the police power when it has a rational relation to the public health, safety, welfare and prosperity of the community and is not in plain violation of constitutional provision, or is not such an unreasonable exercise of this power as to become arbitrary, destructive or confiscatory." *State* v. *Hillman,* 110 Conn. 92, 100, 147 A. 294 (1929); *Bartlett* v. *Zoning Commission,* 161 Conn. 24, 30–31, 282 A.2d 907 (1971). Zoning regulations, so far as they reasonably promote the public health, safety and welfare, are constitutional even though their effect may be to limit the exercise of private property rights. *Chevron Oil Co.* v. *Zoning Board of Appeals,* 170 Conn. 146, 151, 365 A.2d 387 (1976); *Poneleit* v. *Dudas,* 141 Conn. 413, 417–18, 106 A.2d 479 (1954).

A regulation that may have some beneficial effect will not, ipso facto, be considered valid and consonant with the general welfare but, rather, inquiry must also be directed toward whatever detrimental effects a particular regulation has. A regulation that has some relationship to promoting the general welfare or some subset of that concept, such as public health, safety, property values or any of the declared purposes set out in the enabling act in § 8-2, would be valid if it does not at the same time promote or generate results that are contrary to the general welfare. "Where, however, a zoning [regulation], in addition to promoting legitimate zoning goals, also has effects contrary to the general welfare, closer scrutiny of the [regulation] and its effects must be undertaken. The fact that a [regulation] may have some adverse effect is not determinative." *Home Builders League of South Jersey, Inc.* v. *Township of Berlin,* 81 N.J. 127, 139, 405 A.2d 381 (1979). Such a view is not unlike saying, as this court has: "The limit of the exercise of the police power is

necessarily flexible, because it has to be considered in the light of the times and the prevailing conditions. *State* v. *Hillman,* [supra, 105]." *State* v. *Gordon,* 143 Conn. 698, 703, 125 A.2d 477 (1956).

The standard to be used in examining this regulation is the rational basis standard as set out in such cases as *Blue Sky Bar, Inc.* v. *Stratford,* supra. Despite the plaintiffs' claims to the contrary, the recent United States Supreme Court case of *Nollan* v. *California Coastal Commission,* supra, is inapposite on this appeal, even on their constitutional claims.[12] We look to the *Blue Sky Bar, Inc.* standard on both the plaintiffs' constitutional and statutory claims.

In considering whether this regulation works to achieve a proper legislative object of zoning, we must examine it to see if it operates in a manner reasonably related to such a legitimate purpose of zoning. That a corporation interested in the development of real

---

[12] We do not agree with the plaintiffs who urge, on the constitutionality issue, that the recent United States Supreme Court case of *Nollan* v. *California Coastal Commission,* 483 U.S. 825, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987), enunciates the standard of review.

In *Nollan,* which essentially was a "taking" case within the taking clause of the fifth amendment to the United States constitution, the majority held that the standard of review of the land use regulation in that context, viewed in the light of the record and the bases urged in its support by its proponents, i.e., the state of California, was the determination of whether it " 'substantially advance[s] legitimate state interests' " while not denying the owner the economically viable use of his land. Id., 834.

The plaintiffs claimed that on their constitutional claims *Nollan* therefore renders the *Blue Sky Bar, Inc.* v. *Stratford,* 203 Conn. 14, 523 A.2d 467 (1987), standard of rational relationship inapplicable. We do not agree. A close reading of the opinion in *Nollan,* including the separate dissents of Justices Brennan, Blackmun and Stevens, discloses that, contrary to the plaintiffs' claim on this appeal before us, the *Nollan* majority was not, as Justice Brennan claimed, advancing a new standard of review on land-use regulations cases and abandoning the reasonable relationship standard. Justice Scalia, writing for the majority, adequately refutes that claim in his opinion. *Nollan* v. *California Coastal Commission,* supra, 834 n.3.

The *Nollan* case is not applicable to the appeal before us.

property is the owner of the homesite involved in this case must not cloud this inquiry because "[z]oning is concerned with the use of property and not primarily with its ownership." *Del Buono* v. *Board of Zoning Appeals,* 143 Conn. 673, 679, 124 A.2d 915 (1956). Long ago, the United States Supreme Court said: "[T]he line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions." *Euclid* v. *Ambler Realty Co.,* 272 U.S. 365, 387, 47 S. Ct. 114, 71 L. Ed. 303 (1926). The trial court, apparently with *Home Builders League of South Jersey, Inc.* v. *Township of Berlin,* supra, 388, in mind, said "that minimum floor area requirements bear a direct relationship to the cost of a house. The larger the house, the more likely its cost will be greater. Living in a more spacious home, will be more expensive due to higher taxes, mortgage payments, and expenses for heat, maintenance and insurance." This language of the trial court is verbatim from the *Home Builders League of South Jersey, Inc.* case. Id. Thus, the trial court acknowledged the economic reality of the higher cost of a house under such circumstances. Yet, while obviously seriously concerned about the validity of the regulation *"in its present form"* insofar as it relates to the "promotion of public health," a legitimate goal of zoning under § 8-2, the court made no finding that a minimum floor area requirement lower than 1300 square feet would not only promote public health but also serve to conserve the value of buildings. This is particularly troublesome not only given the trial court's obvious acceptance of Mood's testimony, which in its most conservative acceptation certainly justified a lower minimum floor requirement than 1300 square feet, but also in view of the lack of any meaningful analysis by the trial court as to why, in this case, the existing minimum in this zone was *higher,* as it pointed out, than the minimum in other areas of the town.

We recognize that an essential purpose of zoning regulation is to stabilize property uses. *Strain* v. *Mims,* 123 Conn. 275, 287, 193 A. 754 (1937). Nevertheless, "[t]he justification for zoning in any municipality is that it serves to promote the public health, safety, welfare and prosperity of the community." *Devaney* v. *Board of Zoning Appeals,* 132 Conn. 537, 539, 45 A.2d 828 (1946). Conserving the value of buildings is only one facet of this archetypical justification for zoning referred to in *Devaney.* Not only is the minimum floor area requirement in the plaintiffs' zone higher than in other residential zones of the town, but also we note that the plaintiffs put into evidence documents which demonstrated that the minimum floor area requirements for one-story, single-family detached houses in East Hampton are among the highest among all Connecticut towns and cities. That statistical evidence[13]

[13] The following evidence, while not referred to in the trial court's memorandum of decision, came into evidence without objection:

COMPARISON OF MINIMUM FLOOR
AREA REQUIREMENTS FOR ONE-STORY
SINGLE FAMILY DETACHED HOUSES IN
CONNECTICUT: DECEMBER 1977 AND MARCH 1987

|  | December 1977* | | March 1987* | |
|---|---|---|---|---|
|  | Number | Percent | Number | Percent |
| No minimum floor area requirements | 51 | 30.2% | 50 | 29.6% |
| Minimum of 300 to 599 square feet | 3 | 1.7% | 4 | 2.4% |
| Minimum of 600 to 899 square feet | 41 | 24.2% | 47 | 27.8% |
| Minimum of 900 to 1,199 square feet | 53 | 31.3% | 56 | 33.1% |
| Minimum of 1,200 to 1,499 square feet | 19 | 11.2% | 11 | 6.5% |
| Minimum of 1,500 square feet or more | 2 | 1.2% | 1 | 0.5% |
| Total | 169 | 100.0% | 169 | 100.0% |

Source: Based on data contained in "Least Cost Housing: Minimizing the Fiscal Impact of Zoning and Subdivision Regulations," November 1978, p. 6 and a March 1987 survey of Connecticut Zoning regulations conducted by Charles Vidich Associates.

* In 1977 there were 58 municipalities in Connecticut which varied floor area requirements by zone and in 1987 there were 50 municipalities which varied floor area requirements by zone. The table only reflects the minimum floor area requirements found in that zone having the lowest minimum floor area requirements in town."

demonstrates that over 100 other towns and cities have lower minimum floor area requirements for one-story, single-family detached houses than East Hampton. In addition, we note that fifty other towns have no minimum floor area requirements at all.

While urging us not to follow or utilize the *Home Builders League of South Jersey, Inc.* case, the defendants nevertheless urge rather that we do look to the earlier New Jersey case of *Lionshead Lake, Inc.* v. *Township of Wayne,* 10 N.J. 165, 89 A.2d 693 (1952), appeal dismissed, 344 U.S. 919, 73 S. Ct. 386, 97 L. Ed. 708 (1953). Although they concede that *Lionshead Lake, Inc.,* written by then Chief Justice Vanderbilt, is now of "questionable validity" in New Jersey since the more recent *Home Builders League of South Jersey, Inc.* case, the defendants argue that "it may still be very much in line with the Connecticut Supreme Court treatment of pertinent issues." In that context, they refer to *DeMars* v. *Zoning Commission,* 19 Conn. Sup. 24, 109 A.2d 876 (1954), aff'd on other grounds, 142 Conn. 580, 115 A.2d 653 (1955). In sustaining the minimum floor area requirement in *DeMars,* the trial court depended in part upon *Lionshead Lake, Inc. DeMars* hardly helps the defendants for at least three reasons. The first reason is that the minimum square footage requirement in *Lionshead Lake, Inc.,* unlike the regulation in this case, was the *same* in *all* the town's zoning districts. Second, the number of square feet involved in this case, *DeMars* and *Lionshead Lake, Inc.,* are revealing. In *DeMars* v. *Zoning Commission,* supra, 24–25, two residence zones A and B were involved, and the challenge was directed to minimum floor areas of 860 square feet for a single-story dwelling, 720 square feet ground floor area for a one and one-half or two-story dwelling, with a total of 1000 square feet in all, and 720 square feet of floor area for each family in a two-story or more family dwelling, as well as the fix-

ing of a minimum ground floor area of 624 square feet for any dwelling in zone B. In *Lionshead Lake, Inc., v. Township of Wayne,* supra, the New Jersey Supreme Court upheld the imposition of minimum floor area requirements of 768 square feet for a one-story dwelling, 1000 square feet for a two-story dwelling having an attached garage, and 1200 square feet for a two-story dwelling not having an attached garage. These minimum square foot requirements are vastly different from those in the challenged regulation, so urging *Lionshead Lake, Inc.,* and *DeMars* upon us is without merit. The third reason this argument lacks merit is that Mood's testimony concerning the square footage prescribed per person under the American Public Health Association's standards "fit" very aptly even into the figures in *Lionshead Lake, Inc.,* and *DeMars.* This is because the current standards, to which he testified and to which we referred earlier, have been in effect since 1975 but certainly afford more than ample leeway to the average number of persons per household in East Hampton which, according to the latest United States census in 1980, was 2.89 persons. This average was down in East Hampton from 3.26 persons in 1970 and 3.28 persons in 1960.[14] The defendants can thus draw little support from *DeMars.* We do note that on appeal *DeMars* was affirmed, but on grounds other than those on which the Court of Common Pleas had acted. On appeal, this court based its decision on the propriety of the regulations of increasing the minimum size of lots; floor areas were not even mentioned in the opinion.

We examine the trial court's conclusion that the plaintiffs had not proven, with this specific regulation before it, "that regulation by zoning authorities of minimum

---

[14] The plaintiffs' exhibit setting out these census figures also revealed that the average number of persons per household in Connecticut was 3.27 in 1960, 3.16 in 1970 and 2.76 in 1980.

floor area without reference to occupancy does not have a rational basis in conserving values of buildings." The enabling act provides that regulations shall be made "with a view to conserving the value of buildings" and is, therefore, a recognized consideration, among others, in making zoning regulations. General Statutes § 8-2. We must then determine whether, given this conclusion, the challenged regulation is a reasonable exercise of the police power; *Blue Sky Bar, Inc.* v. *Stratford,* supra, 24; the exercise of which, while discretionary, is not absolute. *Damick* v. *Planning & Zoning Commission,* 158 Conn. 78, 83, 256 A.2d 428 (1969); *State* v. *Huntington,* 145 Conn. 394, 398, 143 A.2d 444 (1958). "[Z]oning legislation has been upheld as a legitimate subject for the exercise of police power provided it has a reasonable relation to the public health, safety and welfare, and operates in a manner which is not arbitrary, destructive or confiscatory. See *Bartlett* v. *Zoning Commission,* [supra, 30–31]; *Teuscher* v. *Zoning Board of Appeals,* 154 Conn. 650, 658–59, 228 A.2d 518 (1967); *State* v. *Hillman,* [supra, 100]. Whether specific regulations meet the test of a constitutional exercise of the police power must be determined in the light of the circumstances shown to exist in a particular case. See *Bartlett* v. *Zoning Commission,* supra, 31." *Helbig* v. *Zoning Commission,* 185 Conn. 294, 304, 440 A.2d 940 (1981). " 'Whether the times and conditions require legislative regulation, as well as the degree of that regulation, is exclusively a matter for the judgment of the legislative body . . . . Courts can interfere only in those extreme cases where the action taken is unreasonable, discriminatory or arbitrary. *Carroll* v. *Schwartz,* 127 Conn. 126, 130, 14 A.2d 754 [1940]; *State* v. *Miller,* 126 Conn. 373, 377, 12 A.2d 192 [1940].' *State* v. *Gordon,* supra; see also *Connecticut Theatrical Corporation* v. *New Britain,* 147 Conn. 546, 553, 163 A.2d 548 (1960). 'Every intendment is to be made

in favor of the validity of [an] ordinance and it is the duty of the court to sustain the ordinance unless its invalidity is established beyond a reasonable doubt.' *Connecticut Theatrical Corporation* v. *New Britain,* supra; *Aaron* v. *Conservation Commission,* 183 Conn. 532, 537, 441 A.2d 30 (1981); *Riley* v. *Board of Police Commissioners,* 147 Conn. 113, 117, 157 A.2d 590 (1960)." *Blue Sky Bar, Inc.* v. *Stratford,* supra, 22–23.

In addressing the justification of this regulation because it conserves the value of buildings, we are bound by the trial court's conclusion that the expert testimony of Rowlson was "unconvincing" even though it is not entirely clear that that statement went to all of Rowlson's testimony or solely to his "multiple regression analysis."[15] We observe that, in upholding this regulation, the trial court stressed that minimum floor requirements do indeed bear a direct relation to the cost of a house. The larger the house, the more likely its cost will be greater, the court said, and living in a more spacious home "will be more expensive due to higher taxes, mortgage payment and expenses. . . . " These are realistic observations which, however, raise serious questions in evaluating this regulation. The trial court has already, in effect, conceded that this minimum floor area regulation without reference to occupancy cannot pass rational relation muster on the ground of the promotion of public health, but suggests

[15] In their five page motion for articulation, the plaintiffs also sought to have the trial court "clarify" the basis upon which it rejected Rowlson's expert testimony. In that motion, the plaintiffs argued that, apart from Rowlson's "multiple regression analysis" testimony and opinions based on that, there was "a separate basis," i.e., his thirty years experience as a real estate appraiser, for Rowlson's opinion that floor area was not among the factors that influence the fair market value of a residential home. The motion to articulate was denied. We note that, while explicitly rejecting Rowlson's expert testimony in its memorandum of decision, the trial court does not refer to the testimony of the plaintiffs' expert, Vidich, who testified that the elimination of minimum floor area requirements in several towns with which he was familiar did not have any effect on property values.

that what is bigger and costlier is compatible under the circumstances with conserving the value of buildings in this district. That, in turn, implicitly suggests two justifications for this regulation, both of which are questionable. First, more expensive single-family houses are more desirable and, second, more such houses generate more taxes from persons better able to pay more taxes with perhaps less demand upon municipal services.

The house that the plaintiffs want to erect on the 3.57 acre lot (which cost $40,000) is a modular home for which the contract price is $41,055 and is one whose construction meets the requirements of the Federal Housing Administration (FHA), Veterans Administration (VA) and Building Official Conference of America Code (BOCA), the latter of which the state of Connecticut has adopted for its code. It is capable of being set on the site so that it would comply with the zoning regulations of the town of East Hampton with the exception of the 1300 square foot minimum floor area requirement; it has approximately 1026 square feet of floor area. This house, which is a three bedroom ranch, would be set on a concrete foundation with a concrete cellar beneath it. In addition, site preparation, which included such things as pouring of concrete foundation and cellar, excavation, well, septic, backfilling, access driveway, tie-ins for utilities and the like, the evidence disclosed, would be "just under 18 thousand [dollars]." The total cost for the construction of this home, exclusive of the cost of land, would be approximately $59,000.[16] In the event that the plaintiffs were forced to comply with the 1300 square foot minimum floor

[16] There was evidence in this case that the plaintiffs did not "expect to add in much of a profit [in this case] because we are really not intending to make any normal margins of profit on this." It is thus not entirely certain how much this would have increased the cost of the modular home in this instance.

requirement, the modular home they would have to buy would cost about $10,000 more than the present one, resulting in a total construction cost, exclusive of land cost, of approximately $70,000. The evidence was that Builders had paid $40,000 for the 3.57 acre lot on which it hoped to build this house. From this evidence, it can readily be perceived that the proposed house, together with site preparation, is not unreasonably priced, even given the trial court's apparent reliance on the selective study by the defendants of comparative residential sales in East Hampton by zone from June, 1984, to July, 1986, which showed that 60 percent of the houses sold in the town "sold for $80,000 *or less.*" (Emphasis added.) Despite the implications of the dissent, there is no reference by the trial court or the dissent itself to any evidence that the house intended to be built by the plaintiffs is "significantly undersized" as compared to *any* other house in the neighborhood or that it is akin to a mobile home or that it is aesthetically incompatible with other houses in the neighborhood.

Moreover, the trial court made no finding that smaller houses, and specifically this proposed house, would decrease or destabilize the value of buildings in this zone. To "conserve," ordinarily understood, means "to preserve." Webster's Third New International Dictionary. Here again, there is no finding by the trial court of what the value of buildings in the area of the zones subject to § 5.15 were so as to make a reasonable comparison with the plaintiffs' proposed house upon which to premise a conclusion that requiring that house to have a minimum floor area of 1300 square feet would *not* conserve the value of such buildings. Even conceding, as we have, that the court did not credit Rowlson's uncontradicted expert opinion testimony in that regard, it is not entitled here to conclude that the opposite is true, especially where there is no evidence

to justify that conclusion. *Anderson* v. *Anderson,* 191 Conn. 46, 56, 463 A.2d 578 (1983); *Novak* v. *Anderson,* 178 Conn. 506, 508, 423 A.2d 147 (1979); *Martino* v. *Grace-New Haven Community Hospital,* 146 Conn. 735, 736, 148 A.2d 259 (1959). This also encompasses the rule that a trier of fact cannot, from the disbelief of one party's testimony, infer that an opposing party's allegation, unsupported by any evidence, is correct. *Novak* v. *Anderson,* supra. Moreover, and significantly, our dissenting colleagues misstate the facts when they say we conclude that the presumption of the validity has been overcome, "despite [our] concession that the trial court was not bound to believe the only evidence offered on this issue, upon which the plaintiffs unquestionably had the burden of proof." Even putting aside Rowlson's independent opinion that was not based on his "multiple regression analysis," but upon his thirty years experience as a real estate appraiser, to which the trial court referred, we also referred to the opinion of another of the plaintiff's experts whom the trial court itself characterized as "outstanding and highly respected in their respective fields"—Charles Vidich. Vidich served not only as an independent consultant, but also served for eleven years as the principal planner for the Central Naugatuck Valley Regional Planning Agency, which included thirteen municipalities. He testified that he had made a recent study during which he had examined the zoning regulations of every town in Connecticut, including those which had minimum floor area regulations and which he compared with a similar study he had made in 1977. It was his opinion that in the towns with which he was personally involved there was no effect on zoning enforcement or zoning regulations from the elimination of minimum floor area requirements. He also said that it was his opinion as a land planning use expert that the elimination of floor area requirements "would not have an

adverse effect on the public health, safety and general welfare of the inhabitants of East Hampton . . . [and] that it would not have [any] adverse effect on the property values in East Hampton . . . . '' He said that two of the towns with which he was personally familiar, i.e., Woodbury and Wolcott, eliminated their floor area requirements while a third town, i.e., Thomaston, reduced it from 950 to 750 square feet. The defendants introduced no contrary evidence nor can any fair view of Vidich's cross-examination have been said by the trial court to have adulterated his opinions or facts elicited on direct examination. A trial court cannot conclude the opposite of testimony it rejects where there is no evidence to justify that opposite conclusion. Nor can it arbitrarily disregard, disbelieve or reject an expert's testimony in the first instance. *Rock Creek Plaza-Woodner Ltd.* v. *District of Columbia,* 466 A.2d 857, 859 (D.C. App. 1983). There are times, as the First Circuit Court of Appeals said in *Santana* v. *United States,* 572 F.2d 331, 335 (1st Cir. 1977), that "the trial judge, despite his superior vantage point, has erred in his assessment of the testimony." We, as did the court in *Santana,* "think this is one of those rare cases." Id. Where the trial court rejects the testimony of a plaintiff's expert, "there must be some basis in the record to support the conclusion 'that the evidence of the [expert witness] is unworthy of belief.' '' *Rock Creek Plaza-Woodner Ltd.* v. *District of Columbia,* supra; *Cullers* v. *Commissioner,* 237 F.2d 611, 616 (8th Cir. 1956). The trial court not only never mentioned Vidich's testimony, but did not even refer to him. This serves to place in grave doubt its conclusion that the plaintiffs did not sustain their burden of proof. On this record, we conclude that the trial court was erroneous on this conclusion as a matter of law. The defendants do not and cannot point to any evidence that demonstrates that the challenged regulation serves to conserve the

value of buildings in the areas of East Hampton impacted by this regulation, nor does the trial court refer to any such evidence.

The trial court's support of its position that this regulation is therefore valid as it serves to conserve the value of buildings is untenable on this record. Its conclusion in this regard is further undermined by its having sustained a "varying minima" type of regulation; this generates serious concerns about the lack of evenhanded treatment of potential homeowners in the economic context. This distinction has not gone unnoticed elsewhere. Two frequently cited minimum floor area cases demonstrate this. The Supreme Court of Pennsylvania in *Medinger Appeal*, 377 Pa. 217, 104 A.2d 118 (1954), struck down a zoning ordinance which prescribed a *different* minimum habitable floor requirement in each of the town's districts. In doing so, it held that "neither aesthetic reasons nor the conservation of property values or the stabilization of economic values in a township are, singly or combined, sufficient to promote the health or the morals or the safety or the general welfare of the township or its inhabitants or property owners, within the meaning of the enabling Act of 1931, as amended, or under the Constitution of Pennsylvania." Id., 226. In that case, the court pointed out that with reference to the "sliding minimum scale of habitable floor areas in residential properties," there was "no attempt or intent to measure the habitable area of a home by the number of persons who would occupy it, and there was no proof that the ordinance as drawn would protect or affect any person's health or morals." Id., 224–25. Significantly, the *Medinger Appeal* court noted it was not holding that, under other circumstances, a minimum habitable floor requirement might have a reasonable, direct and proper relation to the health and morals and safety to the occupants of the house and the community in general; we concur in this observation of the *Medinger Appeal* court.

On the other hand, in *Lionshead Lake, Inc.* v. *Township of Wayne,* supra, the New Jersey Supreme Court sustained fixing a minimum floor living space requirement where the ordinance did *not* vary the minimum requirements in each district, but rather made the requirements uniform for the entire town in all districts. One recognized commentator on zoning law has pointed out this distinction between *Medinger Appeal* and *Lionshead Lake, Inc.,* and opined that *Medinger Appeal* "is fair warning to overzealous planning and zoning officials." 4 E. Yokley, Zoning Law and Practice (4th Ed. 1979) § 23-9, p. 157; see D. Hagman, Urban Planning and Land Development Control Law (1975) § 48, pp. 92–93.

The later New Jersey case of *Home Builders League of South Jersey, Inc.* v. *Township of Berlin,* supra, indicated that while the *Lionshead Lake, Inc.* court referred to the fact that, although there are minima below which the health of its occupants might be impaired, it nevertheless rested its conclusion in upholding the ordinance on the protection of land values generally[17] and of the character of the community. *Lionshead Lake, Inc.,* did not discuss the impact of economic segregation. *Home Builders League of South Jersey, Inc.* v. *Township of Berlin,* supra, 146. The *Home Builders League of South Jersey, Inc.* case did, however, go into economic segregation. Drawing upon *Lionshead Lake, Inc.* v. *Township of Wayne,* supra, 174, which itself had acknowledged that with every zoning ordinance "the question remains as to whether or not in the particular facts of the case and in the light of all of the sur-

---

[17] The *Home Builders League of South Jersey, Inc.* court referred to the circumstance that some commentators had interpreted *Lionshead Lake, Inc.* v. *Township of Wayne,* 10 N.J. 165, 89 A.2d 693 (1952), as resting on public health grounds. *Home Builders League of South Jersey, Inc.* v. *Township of Berlin,* 81 N.J. 127, 139, 405 A.2d 381 (1979). That court specifically stated that "[i]f that were [the *Lionshead Lake, Inc.*] basis, it would certainly no longer be sound." Id., 146 n.5.

rounding circumstances the minimum floor-area requirements are reasonable," the *Home Builders League of South Jersey, Inc.* court decided that changes in conditions had indeed occurred since *Lionshead Lake, Inc.,* that warranted addressing directly whether a minimum floor area ordinance that excluded low and moderate income families on fiscal grounds was contrary to the general welfare. In that case, the minimum floor area requirements for single-family residences were not the same. That court determined that it was not demonstrated that there was anything in that ordinance which tied its minimum floor requirements to public health or safety or preservation of the character of the neighborhood, but rather, "the ordinance appears to be directed solely toward economic segregation"; *Home Builders League of South Jersey, Inc.* v. *Township of Berlin,* supra, 148; and the ordinance was, accordingly, invalid[18] "[u]nder these circumstances and in the absence of proof showing a connection between the minima and the legitimate purposes of zoning (public health, safety and welfare), such as would be established by an occupancy relationship . . . ." Id.

Under all the circumstances, the trial court's determination in this case that the challenged "varying minima" regulation without reference to occupancy promotes a legitimate purpose of zoning in that it conserves the value of buildings cannot stand. That determination cannot be supported even giving the commission that deference to which it is due on such matters, which includes our obligation not to substitute our judgment for that of the local zoning authority. The absence of satisfying a proper objective of

---

[18] In this context, it would appear that "[a] developing trend indicates that when minimum floor space requirements are expressly related to the number of occupants in a residence, they have a greater likelihood of surviving due process and equal protection challenges." 1 P. Rohan, Zoning and Land Use Controls § 3.01 [2], pp. 3-49–3-50, and cases cited therein.

zoning raises serious concerns that the only possible justification for such varying minima is an intent to discriminate against those with moderate and lower incomes in that district. This form of denial of access to certain residential districts is unequivocally not a purpose authorized by § 8-2. That this is a realistic concern is also underscored by the testimony of defense witness Steven Tuckerman, the town planner for East Hampton from 1979 to 1985, who asserted that the "only justification" for the 1300 square foot minimum "would be to allow for a range of housing choice . . . [w]ithin the entire town." Forcing home buyers in one part of town to have bigger and more costly houses does not provide a choice of housing but rather prevents home buyers from exercising a choice as to the most appropriate housing for their individual means and needs. Even the trial court realistically recognized that "minimum floor area requirements bear a direct relationship to the cost of a house. The larger the house, the more likely its cost will be greater. Living in a more spacious home will be more expensive due to higher taxes, mortgage payments, and expenses for heat, maintenance and insurance." When a minimum floor requirement has no rational relation to public health and has not been shown to conserve the value of buildings, the conclusion that the requirements are a form of economic discrimination, even if unintended, causes grave concern.

We now reach the trial court's conclusion that "affordable housing" also served as a basis to sustain this regulation.[19] It is evident from the trial court's

[19] The town claims that its special defense of "affordable housing" was a bar to granting the plaintiffs the relief that they sought. It now asks us to consider this as an alternative basis on which to affirm the judgment even though it concedes that it should have done so, but did not, in the manner prescribed by Practice Book § 4013 (a) (1). It urges us to do so not only because of the public importance of this zoning issue but also because there is an adequate record upon which to address this issue. The town

memorandum of decision that, in finding that the regulation involved was valid, it rested its decision in part upon its determination that East Hampton, "through its zoning and other activities, provided for affordable housing." In this context, it said that there are "other" areas in the town which require less floor area for single-family houses and the floor area for multiple-family houses is "appreciably lower." In referring to the study by the defendants of comparative sales of residential values by zones (without identifying any such sales in the particular residential zones covered by the regulation in question) from June, 1984, to July, 1986, the trial court pointed out that the study showed that $80,000 "constituted a house price affordable to the [study's] statistical model's theoretical buyer." That study, the memorandum notes, "showed that 60% of the houses sold in East Hampton for the period of the study sold for $80,000 *or less.*" (Emphasis added.) It then points out that the plaintiffs, at trial, neither moved to strike this special defense nor filed a formal denial of it and, therefore, "its legal sufficiency as a ground to deny plaintiffs their requested relief should be considered as established."

On the other hand, the plaintiffs do not deny that they did not object at trial to the defense evidence on the special defense, but point out that the defendants never raised this claim at trial, but only do so, for the first time, on appeal in their brief. The plaintiffs ask us to treat the lack of a formal denial on the record as waived by the town or to treat it as the parties have, i.e., as part of the case, or in the event that we hold that the special defense stands as admitted, because there is no formal denial in the record, then the only effect is that the factual allegations of the special defense are deemed proven. See *Reese* v. *First Connecticut Small Business Investment Co.,* 182 Conn. 326, 328–29, 438 A.2d 99 (1980).

We have examined the record, including the trial transcripts, the briefs filed by all the parties in the trial court and the exhibits. There is no question but that the parties were actually at issue on this special defense throughout. Moreover, the trial court's memorandum of decision discusses this issue. Therefore, "[w]e [will] review this case on the theory upon which it was tried and upon which the trial court decided it. See *Machiz* v. *Homer Harmon, Inc.,* 146 Conn. 523, 525, 152 A.2d 629 (1959); *Cole* v. *Steinlauf,* 144 Conn. 629, 632, 136 A.2d 744 (1957); Maltbie, Conn. App. Proc. § 42." *Fuessenich* v. *DiNardo,* 195 Conn. 144, 151, 487 A.2d 514 (1985); *Borzencki* v. *Estate of Stakum,* 195 Conn. 368, 375, 489 A.2d 341 (1985).

went on to discuss the town's "considerable efforts to make housing affordable."[20] In addition, it stated that, "[b]ased on census data, the defendant Town had the lowest median house value in Middlesex County and, except for Colchester, had lower median house values than every other abutting town."[21] (Emphasis added.)

---

[20] There the trial court said, in large part, the following: "Zoning provisions are made for cluster housing, combined commercial and residential zones, trailer or mobile home parks, duplexes, condominiums and greenhouse area counting toward floor area. The installation and extension of the sewer system has had an effect on affordability by permitting development on smaller and less costly lots. The town has applied for and received grants totalling in excess of $3,000,000 under various housing programs which grants have funded residential rehabilitation projects and loan programs, the planned extension of sewers into a mobile home park and cottage conversion funds."

[21] In the trial court, the defendants here referred to an abstract from the 1980 census that indicated the following:

"ABSTRACT OF MEDIAN HOUSE*
VALUES IN SELECTED GEOGRAPHIC
AREAS FROM 1980 CENSUS OF
POPULATION AND HOUSING
COMPLETE COUNT TABLES FOR
THE STATE OF CONNECTICUT

| Geographic Area | Median Value |
| --- | --- |
| Chester, Town of | $60,400 |
| Clinton, Town of | 64,600 |
| Cromwell, Town of | 63,600 |
| Deep River, Town of | 61,600 |
| Durham, Town of | 65,600 |
| East Haddam, Town of (abutting) | 61,700 |
| East Hampton, Town of | 59,700 |
| Essex, Town of | 75,800 |
| Haddam, Town of (abutting) | 69,200 |
| Killingworth, Town of | 77,600 |
| Middlefield, Town of | 60,000 |
| Middletown, Town of | 60,300 |
| Old Saybrook, Town of | 69,400 |
| Portland, Town of (abutting) | 63,600 |
| Westbrook, Town of | 66,900 |
| Middletown Labor Market Area | 64,000 |
| Middlesex County | 64,100 |
| Midstate Regional Planning Area | 62,200 |
| Colchester, Town of (abutting) | 56,500 |

The trial court's reliance on its "affordable housing" ground is not proper as a matter of law. Its reference to actions that the town has taken in other areas of East Hampton does not address the rationality and legality of the regulation under attack. "A trial court which gives weight to improper considerations, or ignores those properly relevant . . . commits legal error." *In re Fine Paper Antitrust Litigation,* 751 F.2d 562, 584 (3d Cir. 1983); *Reiley* v. *Healey,* 122 Conn. 64, 72–73, 187 A. 661 (1936). In that connection, the court says that there are "other" areas of the town which require less floor area for single-family houses and that the floor area for multiple-family homes is "appreciably lower."[22]

| | |
|---|---|
| Marlborough, Town of (abutting) | 70,100 |
| Glastonbury, Town of (abutting) | 85,700 |
| New London County (abutting) | 55,000 |
| Hartford County (abutting) | 64,800 |
| Hartford, Town of | 45,700 |
| New Britain, Town of | 49,600 |
| Southington, Town of | 66,100 |
| Windsor, Town of | 63,300 |
| State of Connecticut | 67,400 |

* Taken from Block 39 of the cited publication. See footnote 11, indicating the types of housing units included in this figure."

We note that these median values not only do not refer to any particular zone or type of house but that the figures, coming from the 1980 census, had to be approximately seven years old at the time of trial. We can take notice of the rise of housing values since 1980. "We cannot as judges be ignorant of that which is common knowledge to all men." *Sherrer* v. *Sherrer,* 334 U.S. 343, 366, 68 S. Ct. 1087, 92 L. Ed. 1429 (1948).

[22] Section 5.15.2 of the East Hampton zoning regulations provides: "MULTIPLE FAMILY DWELLINGS: Multi-family dwellings shall have a minimum floor area of 650 square feet per dwelling unit containing one bedroom. A dwelling unit containing more than one bedroom shall provide 150 square feet for each additional bedroom. Stairways, public halls, rooms containing space and/or water heating equipment, garages, open or closed outside vestibules or porches or verandas, and unfinished basement space shall not be counted in computing minimum floor space."

Section 3.4.D.b.2 of the East Hampton zoning regulations contains the following definition of "dwelling unit": "One or more rooms providing complete living facilities for one family, including customary kitchen equipment, sanitary facilities, and a room or rooms for living, sleeping and eating."

It would appear that § 5.15 of the zoning regulations *does* provide for in "other zones" (than those involved in the challenge on this appeal) the "minimum floor area" for a "one and one-half story" (single family) house with a "ground floor" and "second floor" of 1289 square feet, eleven square feet less than the minimum floor area at issue. What the trial court does not point out is that the minimum square footage requirement for a "one story [single-family house] with basement or cellar," in the residence zone in which the plaintiff wishes to build is 1300 square feet but in all "other zones" the requirement is 1100 square feet. Much is also made of the "appreciably lower" minimum floor area requirement for multiple-family homes. This, too, is an illusory distinction. First, the trial court does not find that multiple-family homes (i.e., "multiple-family dwellings") are permitted in those zones regulated by the regulation questioned in this appeal. Moreover, even if they were, the "appreciably lower" characterization loses most, if not all, of its vigor when one places the regulation under attack next to the "multiple-family dwelling" definition. The former has no occupancy based component at all. The latter, i.e., "multiple-family dwelling," at least requires that each "dwelling unit" shall have a minimum floor area of 650 square feet containing one bedroom and that for each such unit having more than one bedroom, there shall be 150 square feet for each additional bedroom. Therefore, a multiple-family dwelling with three bedrooms would be held to a minimum floor area of 950 square feet whereas a single-family house of the type the plaintiffs desire to build is required to have a minimum floor area of 1300 square feet having the same maximum number of bedrooms, i.e., three. Also of real import here is the significant increase of the minimum floor area requirements

over the years since 1955[23] when East Hampton had its first regulation controlling minimum floor area requirements. At that time, the minimum floor area requirements were only 750 square feet for a one-story house and basement and only 850 square feet for a one-story house without basement.

The trial court's memorandum is barren of the existence of "affordable housing," under its definition, in the two residence zones AA-1 and AA-2 controlled by the regulation involved.[24] What happened in other "areas" of town is not relevant to the rationality and legality of this specific regulation as it impacted on

[23] At the trial, the following was part of the plaintiffs' exhibit:

"AMENDMENT TO ZONING REGULATIONS

FLOOR AREAS

Effective date April 4, 1955

FLOOR AREAS:

a. Nothing in this section shall prohibit the completion of a permitted dwelling for which a building permit has been legally issued at the time of adoption of this amendment.

b. An existing dwelling may be structurally altered and enlarged without conformance to the floor area requirements of this section.

c. Except as provided in (a) and (b) above no new structure or building, and no existing dwelling which has been damaged to an extent exceeding 50% of the assessed valuation at the time of such damage, shall hereafter be erected or re-built with living floor area less than the following:

1. For a one story house and basement.     750 sq. ft.
2. For a one story house without basement     850 sq. ft.
3. For a 1½ or 2 story house.     850 sq. ft.
of which the first floor shall contain     750 sq. ft.

4. The first floor area shall be measured outside the foundation walls, and required areas shall not include a porch, garage, storage or heater room.

5. Required second floor area shall have a minimum of 6' clear headroom"

[24] One of the defense witnesses was Steven Tuckerman, who had been the town planner for East Hampton from 1979 to 1985. He testified that, using his experience as a land use planner, the "only justification" for the 1300 square foot minimum that he could think of "would be to allow for a range of housing choice . . . [w]ithin the entire town." (Emphasis added.) He also agreed that all the incentives he spoke to concerning the availability of "affordable housing" did not help the plaintiffs with the lot upon which they wanted to place the modular house, but did point out that it could be put up "elsewhere in town with very minor modification."

these plaintiffs in this zone. The trial court makes no reference to the circumstance that such "affordable housing" existed, if it did, in the residential zones impacted by this particular regulation. No cognizable basis exists on this "affordable housing" ground discussed by the trial court to sustain this regulation on a rational basis. The "affordable housing" ground of the trial court's decision liberally invokes regional circumstances in its discussion of median house values in Middlesex county. The defendants offered evidence to show that East Hampton had the lowest median house value in Middlesex county except for Colchester and that it provided affordable housing in East Hampton "through its zoning and other activities." This regional approach, i.e., Middlesex County, of the defendants is irrelevant. What is relevant is how the regulation, with its varying minima, constitutes a valid exercise of the zoning power as to all those zones in East Hampton that permit single-family residences. The trial court erred here because whether there is affordable housing in zones other than those impacted by this regulation is not legally significant.

We recognize that several years ago General Statutes § 8-2 was amended to provide: "Such [zoning] regulations shall also encourage the development of housing opportunities for all citizens of the municipality consistent with soil types, terrain and infrastructure capacity." The trial court's memorandum of decision does not refer to this amendment or its implications. This amendment uses the word "shall" while there are other provisions of § 8-2 that include the word "may" as to what can be the subject of zoning regulations under § 8-2. This use of "shall" and "may" in the same statute, which is "commonly mandatory and directory in connotation" is "a factor that evidences affirmative selectivity of terms with specific intent to be distinctive in meaning. The words 'shall' and 'may'

must then be assumed to have been used with discrimination and a full awareness of the difference in their ordinary meanings." *Jones* v. *Civil Service Commission,* 175 Conn. 504, 509, 400 A.2d 721 (1978); *Shulman* v. *Zoning Board of Appeals,* 154 Conn. 426, 428–29, 226 A.2d 380 (1967). The statute thus requires that such regulations "encourage" the "development of housing opportunities" not just in some zones for some citizens but "for *all* citizens of the municipality." (Emphasis added.) This duty to encourage such housing opportunities under this amendment must be discharged "consistent with soil types, terrain and infrastructure capacity." There is no claim by the defendants that the "soil types" or "terrain" or "infrastructure capacity" of the zones to which the 1300 square foot minimum floor area requirement applies in any way are such as to disable East Hampton from discharging this duty to *all* its citizens in such a zone. What the town of East Hampton advances as to what may exist in other zones of the town is irrelevant as it certainly does not apply to "*all*" its citizens, and particularly not to the plaintiff Builders. Even the defendants' expert, Tuckerman, the East Hampton town planner from 1979 to 1985 who testified about the incentives East Hampton has provided for "affordable housing," said that they did *not* help Builders with placing its house on the lot it owned because of the 1300 square foot minimum floor area requirement. The defendants cannot properly use what goes on in other zones to prove that there is "affordable housing" throughout the town because that does not apply to the 1300 square foot minimum zone. It therefore follows that, without this 1300 square foot floor area requirement, East Hampton would encourage the development of housing opportunities for "all" citizens of that municipality. Even in the absence of this amendment, the "affordable housing" ground could not serve to sustain this regulation. What occurs in

other zones of East Hampton in that regard does not rationally justify the improper denial of access to the zone governed by the 1300 square foot minimum regulation. This denial of access, even without this amendment of § 8-2, would serve no legitimate goal of zoning under the enabling act in § 8-2.

We conclude that East Hampton's minimum floor area requirements under § 5.15 of its zoning regulations are not rationally related to the legitimate objectives of zoning, including the promotion of health, safety, and general welfare or conserving the value of buildings that are outlined in § 8-2. A per person occupancy based component of a minimum floor requirement, intended to promote public health, is one factor to be considered in whether a zoning regulation satisfies the requisite connection to a legitimate objective of zoning, but it is not the only one. Nevertheless, in the absence of any evidence that demonstrates a rational relation between minimum floor area requirements and the legitimate objectives of zoning in § 8-2, the current East Hampton zoning regulation is invalid under § 8-2. We express no view whether a different minimum floor area regulation, even without an occupancy based component, might conserve the value of buildings, but the challenged regulation clearly does not do so.

## II

Since we have concluded that East Hampton's minimum floor area requirements are not rationally related to any legitimate purpose of zoning as set out in § 8-2, it is not necessary to address the plaintiffs' claim that § 5.15 of the East Hampton zoning regulations denies them due process of law under both the United States and Connecticut constitutions. We ordinarily do not address constitutional issues unless it is necessary. *Carofano* v. *Bridgeport,* 196 Conn. 623, 647, 495 A.2d 1011 (1985). It is not necessary in this case.

There is error, the judgment of the trial court is set aside and, accordingly, a declaratory judgment may enter declaring that § 5.15 of the East Hampton zoning regulations violates General Statutes § 8-2. Although the plaintiffs also seek injunctive relief, none will be entered at this particular time, but rather the defendants are hereby given a period of 120 days from the release of this opinion within which to amend § 5.15 of the East Hampton zoning regulations. Injunctive relief will, therefore, not be ordered at this time because this court trusts that the defendants will abide by the judgment of this court until such time as it shall have been judicially determined otherwise.

In this opinion GLASS and HULL, Js., concurred.

SHEA, J., with whom COVELLO, J., joins, dissenting. As I understand the majority opinion, it recognizes that the protection of property values is a legitimate objective of zoning regulations under the enabling act, but concludes, nevertheless, that a minimum floor area requirement that bars the construction of a house with at least 1026 square feet in a two acre zone bears no rational relationship to that purpose. I disagree with that conclusion and fail to understand how this court in performing its appellate function can draw such a factual inference, especially after conceding that "we are bound by the trial court's conclusion that the expert testimony of [the plaintiffs' witness] was 'unconvincing.' " In the face of the conclusion of the trial court, as stated in the memorandum of decision, that the plaintiffs "failed to carry their burden of proof that regulation by zoning authorities of minimum floor area without reference to occupancy does not have a rational basis in conserving the values of buildings," the position taken by the majority that there is no reasonable relationship between floor area requirements and the conservation of property values seems to be an exer-

cise in appellate factfinding upon a subject where, to say the least, reasonable differences of opinion exist.

To invalidate the East Hampton zoning requirement of 1300 square feet of floor area in a two acre zone as having no rational relationship to the purpose of protecting property values, as specified in General Statutes § 8-2, requires a conclusion that the town could not reasonably have believed that the establishment of such a minimum would protect the value of other properties in the area or promote the "general welfare," another zoning objective included in § 8-2. The majority opinion acknowledges the principle that "[e]very intendment is to be made in favor of the validity of [an] ordinance and it is the duty of the court to sustain the ordinance unless its invalidity is established beyond a reasonable doubt." *Connecticut Theatrical Corporation* v. *New Britain,* 147 Conn. 546, 553, 163 A.2d 548 (1960). It concludes, nevertheless, that this presumption of validity has been overcome, despite its concession that the trial court was not bound to believe the only evidence offered on this issue, upon which the plaintiffs unquestionably had the burden of proof.

This court has frequently declared that "[o]ne of the main purposes of zoning is the maintenance of property values." *Karen* v. *East Haddam,* 146 Conn. 720, 729, 155 A.2d 921 (1959); *Libby* v. *Board of Zoning Appeals,* 143 Conn. 46, 53, 118 A.2d 894 (1955); *Abbadessa* v. *Board of Zoning Appeals,* 134 Conn. 28, 34, 54 A.2d 675 (1947). We have also recognized that such unconventional housing as a mobile home "could have a serious detrimental effect upon surrounding property." *Karen* v. *East Haddam,* supra, 731; *Beerwort* v. *Zoning Board of Appeals,* 144 Conn. 731, 735, 137 A.2d 756 (1958). We have referred to aesthetic considerations as a significant factor in justifying land use regulations under the broad aegis of promoting the general welfare. *Figarsky* v. *Historic District Commission,*

171 Conn. 198, 207–10, 368 A.2d 163 (1976); *Murphy, Inc.* v. *Westport,* 131 Conn. 292, 300, 40 A.2d 177 (1944); *State* v. *Kievman,* 116 Conn. 458, 465, 165 A. 601 (1933).

There is obviously a direct relationship between the appearance of the neighborhood in which property is situated and the value of that property, because most people will pay more for what pleases them visually. The majority opinion does not challenge that fact of economic life. The issue then becomes whether the town of East Hampton could reasonably have entertained the view that the location in a two acre zone of houses substantially smaller[1] in size than a minimum floor area specification of 1300 square feet would probably have a significant effect upon the value of surrounding properties, which presumably comply with that requirement. Some well respected authorities have confirmed that such a depreciating effect is likely to occur. Chief Justice Vanderbilt of the New Jersey Supreme Court expressed this view: "The size of the dwellings in any community inevitably affects the character of the community and does much to determine whether or not it is a desirable place in which to live. . . . Without some such restrictions there is always the danger that after some homes have been erected giving a character to a neighborhood others might follow which would fail to live up to the standards thus voluntarily set." *Lionshead Lake, Inc.* v. *Township of Wayne,* 10 N.J. 165, 174–75, 89 A.2d 693 (1952), appeal dismissed, 344 U.S. 919, 73 S. Ct. 386, 97 L. Ed. 708 (1953). Minimum dwelling size requirements, like those relating to

---

[1] The house the plaintiffs propose to build would have a floor area of 1026 square feet. The requirement of the zoning regulation for 1300 square feet represents an increase of 26.7 percent in floor area. The attendant increase in the cost of the house to make it conform to the zoning requirement would be about $10,000, according to the testimony, or 24.3 percent. These differences may fairly be characterized as "substantial."

architectural conformity, have often been imposed on lot purchasers by private developers in the belief that such restrictions will enhance the value of the entire subdivision. A casual perusal of real estate advertisements in a newspaper, many of which contain references to "executive area," demonstrates the importance of the size and quality of houses in the neighborhood as affecting the probable selling price of a dwelling located in such an area. Whether in fact smaller may be better or housing uniformity may have undesirable social consequences, it is not unreasonable to entertain the view that in the marketplace the location of significantly undersized houses in a neighborhood of uniformly larger houses is likely to reduce the price these conforming properties will bring. Thus, there is a reasonable basis for the town to have relied upon in enacting its minimum floor area requirement in order to protect property values.

I must also express my disagreement with the position taken by the majority that, because the minimum floor area requirement is not applicable throughout the town but varies from 1300 square feet in one and two acre zones to 1100 square feet in other zones permitting smaller lots, it is not reasonably related to any legitimate zoning purpose. If a minimum floor area requirement of 1300 square feet is valid in a zone where only larger lots are permitted, it is wholly illogical to hold that it may not be reduced in zones where lot sizes are smaller. Intelligent use of limited land resources would demand that larger houses be located on the larger lots within a town "to prevent the overcrowding of land," as § 8-2 specifies, and to provide more adequate space for the larger families that are likely to occupy them. Smaller houses, correspondingly, should be permitted in zones where lots are smaller.

The references in the opinion to a "regulation without reference to occupancy" or "nonoccupancy based

minimum floor area requirement'' create an illusion that it would be practical to establish a floor area requirement keyed to the number of persons who may occupy a dwelling. Since almost every house outlasts its original occupants, it is difficult to conceive how such an occupancy based requirement could be effectively implemented in view of the commendable reluctance of officials in this country to intrude into such personal matters as family size.

Although I believe there is a sufficiently rational relationship between the minimum floor area requirement of the East Hampton zoning regulation and the objective of the enabling act, § 8-2, to conserve the value of buildings, undoubtedly this and other zoning restrictions, such as minimum lot area requirements, have contributed toward the stratification of communities and residential areas in this state according to wealth. Some of the discussion in the majority opinion concerning "affordable housing" seems to stem from this concern, although I do not really understand its relevance to the ground of the decision that there is no rational relationship between the floor area requirement and the conservation of property values. The seriousness of the problem of "affordable housing" in this state, of course, cannot be ignored, but it is evident that the judiciary lacks the resources to deal with a social problem of this nature and that only an appropriate legislative response can provide an adequate solution. The decrease in cost that the majority has achieved for the plaintiffs by reducing the total cost of their house and land from about $109,000 needed to satisfy the 1300 square foot floor area requirement to $99,000 for the 1026 square foot structure proposed , about 10 percent less, is not likely to have any significant impact upon the affordability of housing. Hopefully, the majority's striking down of the East Hampton provision at issue and the resulting implications for other communities

will generate some legislative attention to this intricate social problem, with which this court can cope only ineffectively. Nevertheless, I cannot agree with the legal ground upon which the majority decision is based and, accordingly, I dissent.