[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. Introduction and Factual Background
A.
The present appeal concerns an application to construct ten units of affordable housing in West Hartford, Connecticut.[1][2] The applicant, West Hartford Interfaith Coalition, Inc. (hereinafter, "the Coalition"), is a private nonprofit organization composed of individuals from the West Hartford community and eleven local churches and synagogues with a stated purpose "to provide entry level home ownership opportunities for individuals and families of low and moderate income." (Return Items 4, p. 6; 82). At present, the Coalition holds an option to purchase 2561 Albany Avenue, West Hartford, Connecticut, located near the confluence of Albany Avenue and Flagg Road and now owned by Messrs. Martin Levitz and Neil Cohen. (Exhibits 2; C; D; E). The property is approximately 55,000 square feet and is currently zoned R-13, a single family zoning designation requiring 12,750 square feet of lot area per dwelling unit. (Return Items 4, p. 3; 102; Plaintiff's Brief, p. 3). A small tip of land to the east is now vacant and just beyond that is the Bishop's Corner shopping area, one of West Hartford's major commercial centers. Bishop's Corner is surrounded by single family homes with an intervening multifamily zone on three of the corners. There is no multi-family zone on the subject corner but there is a 19 unit multi-family complex west of this site on Flagg Road. (Return Item 4, p. 3). The applicant has filed two applications: (1) a request for a change of zone from R-13 to RM-4 multi-family (4,000 square feet of land per dwelling unit) and (2) a request for special development district designation to construct the project. This court will refer to the applications collectively as the application.
The defendant is the Town Council of the Town of West Hartford (hereinafter, "the Council") which acts as the zoning authority for the Town pursuant to special acts of the General Assembly. 19 Spec. Laws 934, Secs. 1-6; 20 Spec. Laws 188; 22 Spec. Laws 473, Sec. 172; see also, Cascio v. Town Council, 158 Conn. 111, 113 (1969); Clark v. Town Council of West Hartford, 145 Conn. 476, 480-481 (1958); Sullivan v. Town Council of West Hartford, 143 Conn. 280, 282 (1956). CT Page 8032
B.
The instant application was filed on May 6, 1991. (Return Item 1). Three buildings, two four unit buildings of 5,000 square feet and one two unit building of 2,000 square feet, are proposed which will meet the affordability requirements governed by General Statutes 8-30g.[3] (Return Item 1). The Council scheduled a public hearing for June 17, 1991, which after not concluding, was continued to June 27, 1991. On the first night, Donald Foster, West Hartford Town Planner, presented a slide show for orientation, related the history of recent zone changes in the area, and answered specific Council questions about the project. He noted, for instance, that the site as now zoned would probably allow four dwelling units. (Return Item 4, p. 3).
Patricia Williams, the Executive Director of the Coalition, Attorney Robin Messier Pearson, Counsel for the Coalition, and Richard Mahoney, a real estate appraiser, all spoke on behalf of the applicant. (Return Item 4). Ms. Williams discussed the Brace-Dale project, a four family limited equity cooperative, also developed by the applicant in West Hartford, which required similar zoning approvals. Under the cooperative scheme, family occupancy would be based upon certain criteria including "sweat equity" of approximately 300 hours (the "down payment") and an income range of about $10,000 to $34,000 per year. (Return Item 4, p. 7). The families would own and manage the buildings, with a 99 year lease to the land. The proposal also contained restrictions for resale so that the units remain affordable. (Return Items 3; 4, p. 9).
Attorney Pearson's review of the proposal started with a description of the area. She noted that the existing buffer area multi-family zones were denser than the proposed zone with RM-3 (3,000 square feet per unit) to the north, RM-2 (2,000 square feet per unit) to the northeast, and RM-3 to the southeast. (Return Item 4, p. 12). She commented on the Hartmeadow project on Flagg Road which was also developed under the RM-4, special development district concept. She noted further that the Town Planning and Zoning Commission recommended approval of the project and in 1987 had recommended that the site be developed as low density multi-family. (Return Item 51). She reviewed the site plan and such items as height, buffer, sewer, and water proposals noting that the Metropolitan District Commission had approved the project (Return Item 38) and that the West Hartford Design Review Advisory Committee had approved the building design. Indeed, that municipal committee had indicated that "the scale, massing and CT Page 8033 general siting of the buildings, parking and landscaping, (existing and proposed) blends well with the surrounding community." (Return Items 4, p. 17; 50). She further reviewed traffic issues noting that a traffic consultant was not retained as the Town Traffic Engineer, Steven Weitz, believed the ten unit proposal was too small to warrant a review of traffic generation. (Return Item 4. p. 20). She discussed the issue of sight line distance and noted that both the applicant's and Town's traffic engineers had deemed it to be satisfactory. (Return Items 4, p. 20; 15; 49; 87). She reported that Mr. Weitz indicated that there were very few traffic accidents in the area. (Return Item 87). Finally, she noted that the lot coverage for the proposal was 12%, while an R-13 allowed 30%, an RM-4 allowed 20% and that coverage in the general area ranged from 4.6% to 17.4%.
Richard Mahoney, president of a local real estate company and a broker and appraiser with over 30 years experience in town, testified that this project would not have an adverse affect on the value of real estate in the area. (Return Items 4, p. 23; 48).
After the presentation, and questions by certain Council members, a number of West Hartford residents and other interested individuals spoke on the application. A representative of the Northwest Homeowner's Association spoke in opposition based on traffic, environmental, and spot zoning reasons. (Return Item 4, p. 25). A member of the Coalition submitted a petition with 1250 names of residents supporting the proposal. (Return Item 4, p. 46). A representative of the Board of Trustees of a local Jewish congregation reported that that Board supported the project and the President of the League of Women Voters spoke on behalf of the project. (Return Items 4, pp. 46,; 52; 43; 45).
At the continuation of the hearing on June 27, 1991, members of the public again spoke on the application. A member of the West Hartford Housing Partnership testified in support noting that the ten units would assist the town in accomplishing its goal of 281 units (Return Item 5, p. 4). A letter was read from the Mother Superior of the Sisters of Mercy in support of the project. (Return Item 5, p. 15). Likewise, the Executive Director of the Capitol Region Council of Churches spoke in favor of the proposal. (Return Item 5, p. 26). Another individual noted that the other multi-family development on Flagg Road (Hartmeadow) was not comparable since it contained 18 one story cottages on six acres. He also read a letter from a political party in opposition. (Return Item 13).
The public testimony greatly varied, with approximately CT Page 8034 26 people speaking against the proposal and about the same number in favor of the proposal. Additionally, the record is filled with letters and petitions, mostly against the proposal. (In favor: Return Items 17-22; 24; 41; 76-78. In opposition: Return Items 11 (35 pages); 13; 16; 23; 25;26-37; 42; 44; 52-75; 91).
After the public finished, Donald Foster again reviewed the project. He stated that the application met height and setback requirements. (Return Item 5, p. 43). He reviewed the lot coverage of the buildings and traffic safety issues noting that the Town Traffic Engineer had reviewed a revised driveway location and found it acceptable. Additionally, he commented that while the Council had received a great deal of testimony on traffic, the Town Traffic Engineer "does not believe that traffic in that area is a significant issue in relation to this specific property nor would it cause major problems." (Return Item 5, p. 47). In response to a question about the completeness of the plans, he indicated that they were sufficient with a couple of minor points and that the Fire Department, the Town Engineer and Traffic Engineering had approved the application. (Return Item 5, p. 50).
Attorney Pearson then gave her concluding remarks covering a number of the issues raised during the hearings. The meeting was adjourned and the Council deliberated on the application at its August 6, 1991 meeting. After a motion to approve the project, each Council member voiced his or her concerns and on a roll call vote, the motion was defeated 9-0. (Return Item 6). A letter was sent to Attorney Pearson on August 8, 1991 reflecting the Council's action (Return Item 84) and on August 15, 1991, notice of the decision was published in the West Hartford News. The appeal was dated August 30, 1991 and the trial took place on June 24, 1992.
II. Discussion
A1.
The Council has argued, both in its initial and reply brief, that this appeal does not fall within the provisions of the Act as the project is not an affordable housing development. The statutory definition at subsection 8-30g(a)(1) states:
(a) As used in this section: CT Page 8035
 (1) "Affordable housing development" means a proposed housing development (A) which is assisted housing or (B) in which not less than twenty per cent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income, for at least twenty years after the initial occupation of the proposed development;
The Council maintains that the proposed project is neither "assisted" nor "deed restricted". on June 10, 1992, this court heard evidence and argument on a Motion to Dismiss on these grounds. This court ruled at that time that the project certainly met the "assisted" definition and perhaps even met the "deed restricted" definition.
In its submittal to the Council, the applicant stated:
 WHIC's program is designed to meet the criteria of an "affordable housing development" under Section 8-30g of the Connecticut Statutes, and application is being made under the provisions of that section. The range of acceptable income limits for occupants initially will be $12,000 to $34,000, thus making the housing affordable to the young, single parents, families, minorities and persons with disabilities. . . .
 WHIC will pursue land acquisition monies from the State of Connecticut Department of Housing to write down the cost of land acquisition in order to make the units affordable. . . A copy of a PreGate Analysis approved by the Commissioner of Housing indicating that WHIC is encouraged to pursue plans for this site, is enclosed. With the State's assistance and low cost funding for the construction, all ten Albany Avenue units will remain affordable for well over twenty years. Also CT Page 8036 attached to this application for Council's perusal is a model Declaration of Cooperative to be used between WHIC and the ultimate occupants which sets forth the restrictions on resale. . .
 Further, by the use restrictions imposed by the special development district plan, it will ensure that the housing remains affordable under Connecticut General Statutes 8-30g for at least twenty years, a condition of approval which the applicant offers to the Town.
(Return Item 1, pp. 2-4). It is beyond dispute that the applicant was seeking public and private funding to build this project. Proposals had been submitted to the Department of Housing (hereinafter, "DOH"). Indeed, attached to the application was a copy of the DOH Application Review Committee's "Pre-Gate Analysis" reviewing the applicant's proposal to secure almost $1,000,000.00 from the DOH. (Return Item 1). The application also included a September 20, 1990 letter from the applicant to DOH seeking financial assistance. (Return Item 1).
As indicated by the applicant, this proposed development is a limited equity cooperative. General Statutes 8-214f;47-242 ("a cooperative whose declaration contains any restrictions on (1) the amount for which a unit may be sold, or (2) the amount that may be received by a unit owner on the (A) sale . . . of the unit . . . ."). In P.A. 87-417, the General Assembly passed legislation allowing the state to enter in contracts with nonprofit corporations to provide financial assistance for the development of limited equity cooperatives for low and moderate income families. (P.A. 87-417, S. 6).
At the June 10, 1992 hearing on the motion to dismiss, this court received a copy of a June 10, 1991 letter from the Connecticut Housing Investment Fund, Inc. (hereinafter "CHIF") stating that an interest free loan for predevelopments costs in the sum of $11,600.00 was awarded to the applicant to build this project. (Exhibit A). A copy of the note for said sum was also submitted into evidence. (Exhibit B). The Council submitted evidence that the Coalition's application has been "frozen" pending this appeal. (Exhibit 1). Other documents reflecting the DOH approval process were also submitted. (Exhibits 4; 5; 6; 9).
As previously discussed, Attorney Pearson indicated that the units would qualify under the Act in her June 17, 1991 presentation. (Return Item 4, pp. 5; 24). She stated, CT Page 8037 for instance, "[t]he proposal contemplates that the units will all remain affordable under the affordable housing statutes which defines affordable housing developments under 8-30g of the Connecticut General Statutes." (Return Item 4, p. 5). Patricia Williams likewise referred to the loan/grant proposal in her remarks on June 27, 1991. (Return Item 5, p. 64).
Assisted housing is defined to mean:
 "housing which is receiving, or will receive, financial assistance under any governmental program for the construction or substantial rehabilitation of low and moderate income housing, and any housing occupied by persons receiving rental assistance under chapter 138a or Section 1437f of Title 42 of the United States Code;"
General Statutes 8-30g. Pat Downs, Director of Policy and Planning at DOH, testified at the hearing on the motion to dismiss that it appears likely that the proposal will receive construction funding. Notwithstanding this, however, as this project has already received financial assistance from DOH, through CHIF, it qualifies as "assisted housing" under this definition.
2.
The second half of the affordable housing definition concerns the "deed restricted" units, i.e. those projects in which not less than 20% of the units are conveyed by deeds containing covenants or restrictions. . . . The Council argues that there is no evidence that these units will be deed restricted. In addition to the submittals and comments of the applicant already discussed, the applicant submitted a copy of the Brace-Dale Association, Inc. Declaration of Cooperative. (Return Item 3). A similar declaration is proposed to be used for this project. (Return Item 1, p. 2). The declaration is made pursuant to General Statutes 47-200 et. seq., the Common Interest Ownership Act (hereinafter "CIOA"). Rights and liabilities of the members of the community are, of course, governed by the statutory scheme and the declaration and related documents are recorded on the land records. General Statutes 47-204e; 47-220. See generally, Wilcox v. Willard Shopping Center Associates, 208 Conn. 318, 326 (1988). Article X sets forth the restrictions on use, alienation, and occupancy and subsection 10.2 puts a limitation on the amount a departing member may receive from the sale of a unit. Additionally, clearly set forth, in highlighted letters, is the statement "[t]he Association shall not convey a unit to any would be CT Page 8038 purchaser whose income exceeds 80% of the median income for the region as defined in the appropriate federal regulations."[4]
Subsection 10.3 further restricts membership to an applicant with "low to moderate income as defined in the State of Connecticut, Department of Housing and if that agency ceases to exist then by standards as determined by the United States Department of Housing and urban Development." Article XXI states that all unit owners, tenants and mortgagees shall comply with the declaration instruments and that the provisions will be recorded, will run with the land, and shall bind any person having at any time any interest or estate in any unit.
The final aspect of the definition is that the restrictions apply for at least twenty years. The proposed declaration has no such specific limitation since the restrictions apply as long as the community exists (or until terminated). The subsection 10.2 consideration limits do reflect a twenty year period and, as mentioned, the application indicated that the units "will remain affordable for well over twenty years". (Return Items 3; 1).
It is true that the legislature used the word "deed" in its definition. It is also true that the transfer of an interest in a common interest ownership community is done through the delivery of an "instrument, executed in the same manner as a deed." General Statutes 47-204 (e)(6). This court believes that this is a distinction without a difference. The purpose of the restriction by deed was to insure that the restriction ran with the land. This purpose is served by the declaration. A deed is merely an instrument in writing in which an interest in land is conveyed from a grantor to a grantee. The statutory scheme for a conveyance of a unit owner's interest is no different.
In Nationwide Mutual Ins. Co. v. Pasion, 219 Conn. 764,768 (1991), the court restated the longstanding rule of statutory interpretation:
 Statutes are to be construed to give effect to the apparent intention of the lawmaking body; Sanzone v. Board of Police Commissioners, 219 Conn. 179, 186, ___ A.2d ___ (1991); and where legislative intent is clear, there is no room for statutory construction. Kelemen v. Rimrock Corporation, 207 Conn. 599, 606, 542 A.2d 720
(1988). When, however, we are confronted with ambiguity in a statute, we look to "`its legislative history, its language, the purpose it is to serve, and the circumstances CT Page 8039 surrounding its enactment'" to determine the legislative intent. Verrastro v. Sivertsen, 188 Conn. 213, 221, 448 A.2d 1344 (1982).
A review of the legislative history indicates that the Legislature's main concern was the restriction itself and not the method of conveyance. In response to a question concerning exemptions, Representative Cibes stated that the definition covers those units that are "(1) assisted housing, . . . or (3) subject to deeds containing covenants or restrictions which would preserve the units as affordable housing." 32 House Procs., Part 30, May 30, 1989, at 10602-10603. Representative McNally later responded to a question from Representative Fleming stating that the definition of assisted housing is "that which will — dwelling units will be conveyed by deeds containing covenants and restrictions that shall require that such dwelling units be sold at or rendered below prices which preserve the units as affordable housing, . . . ."(sic) 32 House Procs., supra, at 10628-10629.
Senator Blumenthal likewise stated that "[i]f the housing does qualify under the 20% set aside provision, that is to say if 20% of the units are set aside for 20 years under the provisions of this legislation then it would qualify even though not governmentally assisted under that 10% provision." 32 Senate Procs. Part 3, June 5, 1989 at 4051. Each legislator focused on the restrictions — not on the instrument. This court does not believe that the use of the word "deed" precludes a CIOA property, which otherwise complies, from meeting the statutory definition. As this project meets all three requirements, namely, (1) percentage of units conveyed with restrictions, (2) sales price within Sec. 8-39a affordable guidelines and, (3) 20 year restriction, this court finds the project can properly be deemed "deed restricted".
B.
In TCR New Canaan, Inc. v. Planning Zoning Commission of the Town of Trumbull, 6 Conn. L. Rptr. No. 4, 91 (March 5, 1992), (hereinafter, "TCR"), this court reviewed the test for aggrievement under 8-30g(b). That analyses is applicable to this case. Essentially the statute states that:
 "[a]ny person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling CT Page 8040 units . . . may appeal such decision pursuant to the procedures of this section."
In finding that traditional aggrievement rules were not inapplicable to these appeals, this court found that the applicant in TCR, a contract purchaser, was aggrieved. The Coalition also holds an option to purchase. (Exhibit 2). As contract purchasers have been found to be aggrieved, Fletcher v. Planning Zoning Commission, 158 Conn. 497, 503 (1969); Shulman v. Zoning Board of Appeals, 154 Conn. 426, 431 (1967), and as the Council denied this affordable housing application, this court found at trial, and reiterates herein, that the plaintiff has a specific and legal interest which has been injuriously affected by the Council's decision and is therefore aggrieved. Walls v. Planning Zoning Commission, 176 Conn. 475,477-78 (1979).
C1.
General Statutes 8-30g(c) states:
 (c) Upon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that (1) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (2) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (3) such public interests clearly outweigh the need for affordable housing; and (4) such public interests cannot be protected by reasonable changes to the affordable housing development. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal is taken in a manner consistent with the evidence in the record before it.
A review of this section indicates that the Legislature has now placed the burden of proof on the commission (the Council), and not, as in traditional land use appeals, on the CT Page 8041 applicant. Like a traditional appeal, however, the evidence is to be gleaned from the record; the new process is not a trial de novo. The Council is required to cite reasons for its decision and the reasons are to be supported by sufficient evidence.
This court again refers to its decision in TCR, supra, sections II.C.1-5 for a discussion of the standard of review, sufficient evidence rule, and the collective duty to cite reasons.
2a.
The Council debated the application on August 6, 1991. After an initial motion to approve the application, each Councilor commented on the proposal. A roll call vote was taken and the application was unanimously defeated 9-0. The Council did not collectively express its reasons for the denial. As noted in TCR, supra, Sec. II.C.4, this procedure is disfavored.
b.
In reviewing an administrative decision, the rule in Connecticut is that "where a zoning commission has formally stated the reasons for its decision, the court should not go behind that official collective statement of the commission. It should not attempt to search out and speculate upon other reasons which might have influenced some or all of the members of the commission to reach the commission's final collective decision." DeMaria v. Planning Zoning Commission, 159 Conn. 534,541 (1970); Central Bank for Savings v. Planning Zoning Commission, 13 Conn. App. 448, 457 (1988); Allied Plywood, Inc. v. Planning Zoning Commission, 2 Conn. App. 506, 512
(1984). The reviewing court "ought only to determine whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations which the authority was required to apply under the zoning regulations." First Hartford Realty Corporation v. Plan Zoning Commission,165 Conn. 533, 543 (1973); DeMaria v. Planning and Zoning Commission, supra, 540. Of course, where there is a failure to comply with the obligation to state reasons, the action is not deemed void but the court must search the record to see whether the board was justified in its decision. Zeiky v. Town Plan Zoning Commission, 151 Conn. 265, 268 (1963). In the present case, the Council members did not give a formal collective statement for the denial. Individual reasons were stated prior to voting. As noted in TRC, supra, II, C. 4, CT Page 8042 "these individual views are not available to show the reasons for, or the ground of, the board's decision." Welch v. Zoning Board of Appeals, 158 Conn. 208, 214 (1969). See also, Schwartz v. Town Planning Zoning Commission, 168 Conn. 285,290 (1975); Morningside Assn. v. Planning Zoning Board,162 Conn. 154, 156 (1972); Woodford v. Zoning Commission,147 Conn. 30, 31 (1959). This same situation was recently discussed in protect Hamden/North Haven from Excessive Traffic 
Pollution, Inc. v. Planning and Zoning Commission, 220 Conn. 527,544-545 (1991) in which the court reaffirmed the principle that "`reasons' given by certain members of the commission did not amount to a formal collective official statement of the Commission." In footnote 15 therein, the Court commented on its decision in Stankiewicz v. Zoning Board of Appeals,211 Conn. 76, 77-78 (1989) in which it affirmed the Appellate Court's ruling that the trial court was obliged to search the record where the stated reasons were inadequate. Additionally, the court stated "nor is it appropriate for a reviewing court to attempt to glean such a formal collective statement from the minutes of the discussion by Commission members prior to the Commission's vote." Protect Hamden, supra, 546, f. 15.
It is clear that if this was a traditional zoning appeal, the Council's decision should be sustained as "courts cannot substitute their judgment for the wide and liberal discretion vested in the local zoning authority when it is acting within its prescribed legislative powers." Stiles v. Town Council, 159 Conn. 212, 218-219 (1970). The record has sufficient evidence to satisfy the traditional standards of review. The refusal to downgrade the zone would certainly be a proper exercise of the Council's discretion. Cascio v. Town Council, supra, 114.[5][6]
It is not enough, however, in a municipal affordable housing decision, to simply express concern over the size of a project. Section 8-30g(c) requires more. The concerns must be necessary to protect the public interest in health, safety, and other matters in which the Commission may legally consider and they must clearly outweigh the need for the affordable housing. A review of the record indicates that many of the individual comments concerned the size or density of the project.[7]
Councilor Price stated in part, "[i]t is not any one item. It is the size of the whole project." Councilor O'Brien stated that he voted for the Brace-Dale project because it was smaller. Councilor Klebanoff indicated that the density of the concept was too great. Councilor Matties stated that he "would rather see some of the people end up in small single family homes that are on the market right now. I think everything that can be accomplished through this development would be accomplished that way." Councilors French, CT Page 8043 Johnson, and McKernan also expressed their concern about the density.
Assuming these concerns meet the requirements of8-30g(c)(1) and (2), there is no evidence that such concerns clearly outweigh the need for affordable housing. General Statutes 8-30g(c)(3). West Hartford does not qualify for the statutory exemptions under the Act, 8-30g(f); (g). The Legislature amended General Statutes 8-2 (the zoning enabling act) in 1984, P.A. 84-263, to add the sentence, "[s]uch regulations shall also encourage the development of housing opportunities for all citizens of the municipality consistent with soil types, terrain and infrastructure capacity." Our Supreme Court has interpreted this to mean that such [zoning] regulations "`encourage' the `development of housing opportunities' not just in some zones for some citizens but `for all citizens of the municipality.'" Builders Service Corporation v. Planning Zoning Commission, 208 Conn. 267, 305, (1988). In this case, soil, terrain and infrastructure considerations have no impact on this project. The existing multi-family areas on the other three sides of Bishop's Corner are all more intensely developed. The Hartmeadow project is, according to Mr. Foster, "slightly lower than what is asked for by this applicant. . . ." (Return Item 4, p. 3). The Brace-Dale project, previously approved, has a greater density (but fewer units). The lot coverage of 12% not only meets the existing R-13 standards allowing up to 30% coverage but also the proposed RM-4 standards of 20% coverage.
The Council has simply not met its burden of proving that the size of this project, the ten units or, the increase of six units over the allowable four units, outweigh the need for this approval. A statement of concern simply does not meet this higher standard of proof. See generally, Huntington Branch NAACP v. Town of Huntington, 844 F.2d 926, 939 (2nd Cir. 1988), aff'd 488 U.S. 15, reh. den. 488 U.S. 1023 (1988), discussed in TCR, supra, section II.C.6.a.
c.
A number of other concerns were expressed by different council members. Councilors Matties and Price were concerned about the sight line. Councilor Matties also expressed concerns about spot zoning and the desire to utilize other property. Councilor Price was not satisfied with the placement of the buildings. Councilors O'Brien and Knight believed the project violated the Town Plan of Development. Councilor Knight also believed there was a safety issue due, in part, to lack of sidewalks. Councilor French expressed concern over the lack of green space and Councilor Hickey was worried about CT Page 8044 setting precedent by approving this project. As previously stated, none of these individual reasons are available to show the grounds for the Council's decision. Welch v. Zoning Board of Appeals, supra, 214. More importantly, if they had been formal collective reasons, the Council would have to further prove that any one of them would outweigh the need for the housing. The burden switching mechanism of 8-30g(c)(1) — (4) has changed the rules.
d.
The Act enables a developer who has had an application denied the opportunity to file an amended application "to respond to some or all of the objections or restrictions articulated by the Commission." General Statutes 8-30g(d).
There is no requirement that the applicant file that amended application and it was not done in this case. As the Council did not collectively state its reasons, it would be extremely difficult for this applicant to utilize the provisions of this section.
III. Conclusion
In adopting the Act, the General Assembly recognized a need for more affordable housing in the State of Connecticut. In its 1989 report, the Blue Ribbon Commission on Housing,[8] detailed the affordable housing shortage in "Connecticut with an assessment, by region, of the housing needs of the state. Overall, the state was deficient by 181, 535 units and for the Capitol area, 35, 145 units, or a deficiency percentage of 12.89%. (BRC report, pp. 7-9). The co-chairmen of the Blue Ribbon Commission emphasized the magnitude of the problem in their transmittal letter to the Legislature by stating:
 Throughout the period of our deliberations, the housing crisis continued to threaten the welfare of our citizens and the economic prosperity of our business community. We believe that, if the recommendations made by the Commission are adopted, great progress can be made in producing new affordable housing, preserving existing affordable housing, preventing homelessness, and planning land use strategies that benefit all our citizens. CT Page 8045
The report served as a basis for legislation including recommendation three, the appeals procedure utilized in this case. As previously mentioned, the burden switching mechanism in this legislation requires the local commission, or in this case, the Council, to justify its decision. The town must prove that its denial outweighs the need for the proposed affordable housing. A statement that the proposed project is too large or too dense will not, without more, carry the day. The issue (or the need) is too important. The Council has failed to meet its burden in this case and the decision is therefore reversed and the application granted.
MARSHALL K. BERGER, JR. JUDGE, SUPERIOR COURT