[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I.
Introduction
This is the second decision in this matter concerning a proposed affordable housing complex in Berlin, Connecticut. The trial was held on March 10, 1993 and on May 14, 1993, this court issued its opinion ordering a remand to the defendant Commission (9 Conn. L. Rptr. No. 7, 193 (July 5, 1993)). CT Page 8862
In the first opinion, this court discussed the proposed 14.5 acre 32 lot single family subdivision known as Arbor Commons. The parcel is presently zoned R-43 which requires 42,000 square foot (one acre) lots while the proposal would reduce the lot size to 13,000 square feet with individual lots ranging from 8,000 to 23,000 square feet. This court will not reiterate the factual background in this opinion. Those facts are incorporated and made a part of this opinion. Indeed, this decision should be read as simply the second part of the March 10, 1993 opinion.
In the initial opinion, this court was concerned with whether the applicant's proposal to not finish the upstairs of the affordable units would prevent the units and the complex from satisfying the financial guidelines of General Statutes 8-30g(a). Thus, this court remanded the matter for a determination as to whether the units, if fully completed, would fall within the statutory definition. On July 27, 1993, the Commission, through its attorney, filed a Return of Record reflecting the Commission's actions on remand. After publication of notice on May 28, 1993 and June 4, 1993, the Commission held a public hearing on June 8, 1993. (Return Items YY; ZZ). At the hearing, Attorney DeMille read a letter indicating that the upstairs would be completed for each affordable unit and that these units would meet the financial guidelines. (Return Items ZZ; DDD). After discussion with the Commission, the public hearing was closed that evening. On June 29, 1993, the Commission met at a special meeting and made the following two findings:
(1) that the affordable units would be comparable in size and workmanship to the market rate units, and
(2) that the sales price of the finished affordable units would meet the cost guidelines required by General Statutes8-30g. (Return Items BBB; CCC).
This court's questions, set forth in the first opinion concerning reason three and the first part of reason four, have now been satisfactorily resolved. The remainder of this opinion will address the other seven reasons stated by the Commission in denying the proposal.
II. CT Page 8863
Discussion
 A.
1.
The first and fifth reasons state:
 1. The plan does not comply with existing regulations for the R-43 zone nor with the existing affordable housing regulations. The Commission is therefore prohibited from approving this proposal by Section 8-26 of the statutes.
 5. The applicant did not seek the remedy of an amendment to the zoning regulations or amendment to the zoning map.
These reasons, non-compliance with the existing R-43 zone, raise a significant legal issue: namely, whether an applicant must seek an amendment to the zoning regulations and/or the map prior to filing an affordable housing application which does not comply with the existing zoning regulations.[1]
As indicated, this development proposes to construct homes on an average lot size of 13,000 square feet with individual lots ranging from 8,000 square feet to 23,000 square feet and with corresponding bulk variations. The proposal clearly does not satisfy the requirements of the present R-43 zone with its one acre per building lot requirement. (Return Item TT, 4.11).
The town maintains that irrespective of whether a subdivision application can be made, the fact that the application does not conform to the present zoning requirements is automatic grounds for denial. It refers to legislative history, traditional zoning law, and this court's decision in TCR New Canaan Inc. v. Planning Zoning Commission of the Town of Trumbull, 6 Conn. L. Rptr. No. 4, 19 (March 30, 1992), for support of this position. It should be noted, of course, that the definition of "affordable housing application" includes "any application made to a commission in connection with an affordable housing development . . . ." "Commission" is defined to include a separate planning commission, as opposed to a separate zoning or combined zoning and planning commission. General Statutes 8-30g(a)(4). A planning commission, that is CT Page 8864 a Chapter 126 commission, is of course, responsible for acting on municipal improvements, preparing the plan of development and regulating the subdivision of land. Cristofaro v. Burlington, 217 Conn. 103, 107 (1991); citing Purtill v. Town Plan and Zoning Commission, 171 Conn. 480, 483 (1976). The legislature has included a subdivision application within the class of affordable housing applications.
In TCR, supra, this court discussed the applicability of the Act to legislative decisions of a zoning commission such as a change of zone. In that case, the applicant sought an amendment to the zoning regulations to create an affordable housing development zone, an amendment to the site plan regulations and the actual rezoning of its parcel. This court held that a legislative action, i.e. the decision to change a zone after the receipt of an application for an affordable housing development, was within the purview of General Statutes8-30g. TCR, supra, II.A. In finding that "any application" applies to an initial zone change, this court stated:
 If the Act did not apply to zone changes, one could safely assume that the Act would have little effect in remedying the affordable housing shortage. Before one can get up to bat and file for site plan or special permit review, one needs to get into the park. The multifamily or increased density use must first be allowed and property rezoned. "Any" application has to include that first step. Otherwise, it will be business as usual and there will be no opportunity to address the problem. Courts must presume that legislatures do not intend to enact useless legislation. Bergner v. State, 144 Conn. 282, 287, 130 A.2d 293 (1957). TCR, 6 Conn. L. Rptr. No. 4, 98.
This court rejected the argument that utilization of the traditional first step, the zone change, when accompanied by the development proposal was not an affordable housing application.[2]
The Commission maintains that implicit in the TCR ruling is the notion that the affordable housing development must comply with the standards of the underlying zone. Otherwise CT Page 8865 why seek the change? This court was not faced with this issue in TCR. Thus, that decision should not be taken to mean that zone change action or conformity with the existing zone is a required first step. This court believes that the TCR procedure is logical and consistent from a traditional zoning view but it is not necessarily required in affordable housing cases. The Act is a clear departure from traditional zoning; it requires all parties — commissions and applicants — to sail in waters with an uncompensated compass and out of date charts. Some guidelines were offered by the legislature — but only a few.
In discussing the conflict between a noncomplying project and existing zoning, the following discussion occurred in the House:
REP. FARR: (19th)
 Through you, to Representative Cibes, if the proposed plan called for a substantial change in the longstanding zoning in the area of the community, would that in itself be sufficient grounds for the denial?
DEPUTY SPEAKER SMOKO:
Would you care to respond?
REP. FARR: (19th)
 Or to give you a better example, an area that's zoned single-family has got some vacant land and now the proposal is to put up multi-family, would that in itself be a basis for the denial?
REP. CIBES: (39th)
 Through you, Mr. Speaker, the answer is no, not per se. The municipality might have very good grounds for having no multifamily dwellings in the particular area. The soil type, the capacity of the infrastructure, various reasons such as that CT Page 8866 might have been a reason for the municipality not to adopt a particular zone for that particular areas, but per se, there would not a reason for rejecting this application.
House Proceedings, Vol. 32, Part 30, May 30, 1989, 10608-10609.
Still, in the Senate, Senator Blumenthal noted that:
 And it is important to understand that these decisions involve specific projects on particular pieces of land and do not provide for any kind of general zoning override.
32 Senate Procs., Part 3, June 5, 1989, at 4048.
The legislature was not clear on whether zone conformity was required. Rather, the comments suggest that zone conformity should not necessarily be an impediment for specific projects.
As stated in TCR, supra, II.A., this court believes that the clear intent of the legislature was to alleviate the shortage of affordable housing in Connecticut — thus the passage of this revolutionary burden of proof and review legislation. The argument posited by the Commission that nonconformance with bulk and lot requirements in the underlying zone is sufficient to defeat an application is no different in a practical sense than that argued in TCR — it keeps the affordable housing from being built. This court believes in the niceties of the formalistic approach of applying for a zone change, (or the establishment of a new zone) combined with the administrative permit, whether site plan or subdivision, but finds it is not always required. Again, as noted in TCR, supra, II.A., the Blue Ribbon Commission[3] was cognizant of Huntington Branch NAACP v. Town of Huntington, 844 F.2d 926 (2nd Cir. 1988), app'd 488 U.S. 15, reh. den. 488 U.S. 1023 (1988), a case which held that refusal to rezone a white neighborhood designated single family to allow multifamily was a violation of the Fair Housing Act. As part of the Huntington litigation, the court noted that it had earlier held that "contrary to the town's assertion, appellants were not required to exhaust local remedies by filing a formal application for rezoning." CT Page 8867 Id., 928, citing Huntington Branch NAACP v. Town of Huntington,689 F.2d 391, 393 (2nd Cir. 1982), cert. den. 460 U.S. 1060
(1983).
3.
This court must also address the issue of the denial based on noncompliance under traditional land use law. There is no question that if this were a standard subdivision appeal, the Commission's decision would be sustained. Indeed, the outcome is so obvious that the applicant would probably not have filed this appeal. General Statutes 8-26. But this is not traditional zoning and thus, in this case, this court finds that the deviation from the existing R-43 zone is not fatal. First, as indicated, this court believes the legislature knew that an application might not comply with the underlying zone. Second, this case presents a situation in which the variation is not a use variation but rather a bulk and lot variation. In other words, the use, single family housing, is allowed in the zone. The focus concerns the design standards and lot size. The basic request is thus not totally inimical to the underlying zoning regime. It is precisely this situation which prompted the passage of the Act. Indeed, the Act was another piece of legislation recognizing the need for more diversity in housing. As noted by Judge Mottolese in Pratt's Corner Partnership, supra, 292:
 The General Statutes are replete with forceful legislative expressions of the long standing statewide need for affordable housing both as defined in 8-39a and 8-30g. In the area of land use, the legislature first broached the concept of affordable housing when in 1984 it obligated every zoning commission, by regulation, to "encourage the development of housing opportunity for all citizens of the municipality consistent with soil types, terrain and infrastructure capacity." P.A. 84-263. In 1988, the General Assembly passed P.A. 88-338 "An Act Promoting The Development of Affordable Housing Through the Use of Municipal Planning and Zoning Authority" which authorized zoning commissions to enact regulations permitting special CT Page 8868 exemptions from density limits to developers who agree to construct units of affordable housing. In 1991, the legislature amended 8-2 to broaden the mandate for affordable housing to include the needs of residents of the planning region in which the municipality is located and to promote choice and economic diversity in housing for low and moderate income households. P.A. 91-392. This amendment not only applied to the legislative power of a land use authority but also to the planning power so that the municipal plan of development was thus required to reflect the mandate.
Our Supreme Court has likewise noted that General Statutes requires that "[zoning] regulations `encourage' the `development of housing opportunities' not just in some zones for some citizens but `for all citizens of the municipality.'" Builders Service Corporation v. Planning and Zoning Commission,208 Conn. 267, 305 (1988).
This case does not present a scenario in which the developer, under the guise of this statute, is seeking to develop with no standards for the town to judge the application. Our courts have consistently stated that a commission should have standards upon which to review an application. For instance, in Monroe v. Middlebury Conservation Commission,187 Conn. 476, 484, the court stated, in addressing the need of the agency to have a properly promulgated regulatory plan that:
 This provision presupposes the existence of such a regional plan. To hold otherwise, to permit an administrative agency to develop an ad hoc plan as a yardstick against which to measure any given proposal, is to substitute whimsy for sound judgment. Given an administrative agency such absolute power could deprive a landowner of his property, without due process of law. Although due process is not intended to hold administrative agencies under a short leash, it is designed CT Page 8869 to restrain them from roaming at will over the adjudicative landscape. To avoid such constitutional problems, statutes sometimes specifically preclude an administrative agency from exercising its statutory powers until it adopts appropriate regulations to govern its doings. (Citations omitted).
It is just as unfair for a Commission to regulate without standards as it is for an applicant to seek a permit without compliance with any standards. The yardstick is certainly needed in affordable housing applications. Surely there must be some basis upon which the Commission can scrutinize the application. Additionally, how does a Commission conduct the review of more than one application — what standard is used for future affordable applications?[4]
In this case that issue is resolved as the application did comply with the Commission's existing R-7 zone standards. (Return Item TT, Section 4.11 Use and Bulk Table). First, in an R-7 zone, the Commission allows, as permitted principal uses, those uses allowed in an R-11 (which permits two family dwellings) and R-86 (detached single family dwellings, farms and golf courses). Additionally, but not at issue here, several other uses, including but not limited to churches, parochial, private and public schools, colleges, nursery schools, hospitals, religious, charitable and eleemosynary institutions, public utility substations, telephone exchanges, water filtration plants, camps, riding stables, bus shelters, produce stands, cemetaries [cemeteries], municipal administration buildings and housing for the elderly are allowed by special permit or other more involved permitting programs. All of these uses are allowed in the present R-43 zone with the exception of two family and housing for the elderly — neither of which are involved here.
In terms of bulk requirements, the minimum lot size is, of course, larger in the R-43 zone and the other limitations are as follows:
Requirement R-43 R-7
Width of lot frontage 150 60
Depth of front lot 250 115 CT Page 8870
Minimum yard dimensions (front) 50 20
Minimum yard dimensions (side — at least one) 30 8
Minimum yard dimensions (side — total of two) 60 18
Rear 50 30
Minimum floor area per dwelling unit in sq. feet (total) 1300 900
Maximum building 2 1/2 stories 2 1/2 stories height 35 feet 35 feet
Minimum usable open 1200 sq per 1200 space dwelling unit 1200
Other provisions and regulations — Same as R-86 for both.
Balanced against these figures are the uses that could be placed in the R-43 zone by special permit and their specific bulk restrictions. A hospital must only be setback 100 feet, parking areas only 50 feet and a height restriction of 3 stories or 45 feet; parochial and private elementary schools require 200 feet of frontage but the junior and senior high school require 400 feet of frontage with side lines at 200 feet; the utility substations and water plants must comply with yard setbacks but be no less than 25 feet; the elderly housing, which requires a lot area for an efficiency unit of 2800 square feet has a 50 foot setback for front and rear property lines and 15 feet for side lines.
It is clear that the wide range of possible uses and bulk requirements for the R-43 zone indicates that the Commission envisioned a flexible approach to the comprehensive plan. The present proposal is a permitted use which only differs from the existing R-43 in certain bulk dimensions. Indeed its variation with side yard or rear yard requirements is perhaps CT Page 8871 to some, far less of a departure, in a Euclidian sense,[5] from a water filtration plant, school or hospital. Yet what is significant is that from a public health, safety and welfare perspective, the proposal meets promulgated town standards. It can be fairly judged according to those standards, as any other application filed before or after. This court concludes, therefore, that these reasons, noncompliance, are, under these circumstances, not sufficient reasons to deny the application. The legislature anticipated this scenario and chose to apply the new judicial review test to this situation. Thus, the prohibition of the second sentence of General Statutes8-26 ("provided nothing in this section shall be deemed to authorize the commission to approve any such subdivision or resubdivision which conflicts with applicable zoning regulations") is not controlling. More specific legislation always controls general legislation, Oles v. Furlong, 134 Conn. 334,342 (1948) and the latest expression of the legislature prevails over a conflicting prior enactment. Moran v. Bens,144 Conn. 27, 30 (1956). Indeed, there is nothing in General Statutes 8-26 which allows an override in traditional subdivision review, Cristofaro v. Burlington, supra, 107; but it is not this section which controls — it is 8-30g.
Similarly, the uniformity provision of General Statutes8-2 ("all such regulations shall be uniform for each class or kind of buildings, structures, or use of land throughout each district") is not controlling either. "The requirement of uniformity in the regulations is to assure property owners that there shall be no improper discrimination, all owners of the same class and in the same district being treated alike . . . ." Veseskis v. Bristol Zoning Commission, 358, 360 (1975). Yet this too has an exception: "[t]he statutory requirement of uniformity does not militate against the grant of a specific exception to a general zoning requirement so long as the exception is reasonable and for the general community benefit rather than for the benefit of a single landowner." Lavitt v. Pierre, 152 Conn. 66, 75 (1964). There is no question that the legislature has deemed affordable housing development as a benefit to the whole Connecticut community. Public Acts 88-338; 89-311; 91-204; 91-392. See generally, Kaufman v. City of Danbury, supra, 597-599. General Statutes 8-30g is not the traditional zoning statute and a proposal which might or does offend the existing zoning scheme does not necessarily doom the application. Thus, the scenario encountered in Bartsch v. Zoning Commission, 6 Conn. App. 686
CT Page 8872 (1986) (perpetual restrictive covenant limiting the use of the property to a medical office building and a requirement of a green belt as a condition to a zone change) and the court's ruling that the Commission violated the uniformity requirement does not control here. The above referenced public acts are all later expressions of the legislature. Moran v. Bens, supra.
This does not mean that the Commission's first and fifth reasons might not stand in a different factual context such as an incompatible use or a lack of unreasonable standards. Nor does it mean that the reasons could not be backed up by a record that proved the variation was in an area that constituted a substantial public interest in health, safety or other matters which are proper for the Commission to consider. General Statutes 8-30g(c)(2); Builders Service Corporation v. Planning Zoning Commission, supra.
In this case, the reasons, without more, are simply not sufficient.
 B.
Closely related to reasons one and five, is reason nine:
 9. Approval of this application would subvert the planning process for affordable housing as outlined in the Plan of Development.
The Plan of Development in effect when the application was filed was the 1974 Plan of Development. (Return Item VV). A review of that Plan indicates that when written, multifamily housing was prohibited, no garden apartments existed and a modest number of apartments were predicted to be constructed (700 units over 20 years). The goals and policies section stated, in part, as follows:
 1. Provide an appropriate mix of housing types, including apartments, so as to assure that a variety of those age and income groups actively seeking housing accommodations in Berlin will be able to find them. . . . CT Page 8873
 3. Maintain the strength and stability of existing and future single family neighborhoods.
 4. Provide through zoning the opportunity for new building techniques and new neighborhoods which are well designed and which offer a variety of housing types. (Return Item VV, p. 25).
Inasmuch as the Plan actually had stated goals of a mix of housing types and is silent on the issue of affordable housing, it is difficult to find support for reason nine.
This court is, of course, aware that traditionally plans of development have not been binding on land use commissions, Dooley v. Town Plan and Zoning Commission, 154 Conn. 470,473 (1967) and that the plans are advisory only. Levinsky v. Zoning Commission, 144 Conn. 117, 123 (1956).[6]
Additionally, the legislative history of the Act reflects an awareness of a potential conflict with an existing plan of development:
REP. FARR: (19th)
 Through you, Mr. Speaker, to Representative Cibes, if the proposed development was inconsistent with the municipality's plan of development, would that in itself be grounds, sufficient grounds for denial upon appeal?
DEPUTY SPEAKER SMOKO:
Would you care to respond?
REP. CIBES: (39th)
 Through you, Mr. Speaker, that, I think, would not be the case.
House Proceedings, supra, Vol. 32, Part 30, 10607.
To the extent Berlin was in the process of promulgating CT Page 8874 a new plan of development which was not in effect when this application was filed, it could obviously have no bearing on this decision. The new Plan, according to the defendant, was adopted April 1, 1992.
 C.
Reason two states:
 2. There was insufficient demonstration that there would be no adverse impact on the adjacent neighborhood.
As previously mentioned, the burden is on the Commission to prove, based on evidence in the record, that a denial is necessary to protect substantial interests in health, safety and other matters that the Commission can legally consider and that such interests outweigh the need for affordable housing. This court cannot see how this proposed cluster project could have such an adverse impact. The Commission has not met its burden on this issue as the record does not contain evidence of any safety or other problems. The project will have both sewers and public water. The applicant consented to the one recommendation by the Board of Police Commissioners, to relocate the street entrance. (Return Items I; N). To the extent the Commission is suggesting that the project would have a negative financial impact, it has failed to meet its burden on this issue. See generally, Builders Service, supra, 282-298.
 D. Reason four is:
 4. There was no information given on housing prices nor any financial justification given for the proposed density bonus.
General Statutes 8-30g(b) defines affordable housing development as:
 (A) assisted housing or (B) in which not less than twenty per cent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require CT Page 8875 that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income, for at least twenty years after the initial occupation of the proposed development;
At the first public hearing, the applicants, through their attorney, stated that this application was submitted pursuant to the Act and would comply with the restrictions of the Act. Attorney DeMille stated, as previously indicated, that the financial information was published by the Connecticut Housing Authority[7] and that "[if] you multiply $42,600.00 by 80%, you get $34,000.00 and change. If you multiply that by 30%, you get $10,200.00 and change, divide that by 12, you're talking $852.00 a month. That's the type of range we're talking about. These numbers will differ from time to time, as the median income goes up or down." (Return Item D, p. 2). The building plans also indicate that the affordable housing lots are "subject to price restrictions for affordable housing." (Return Item QQ).
Additionally, the transmittal letter dated October 22, 1991, indicates that the plans "have been prepared and designed around an affordable housing concept in accordance with state statutes." (Return Item Y).
The applicant also submitted a copy of the proposed restrictive covenant at the hearing. (Return Item O). Thus, while the exact price of the homes was not stated, that is of no great importance since the applicants have clearly shown their intention to comply with the statutory requirements. Finally, as indicated in the introduction to this opinion, the Commission, at its June 29, 1993 meeting, found that the proposal does satisfy the statutory guidelines.
The second part of this reason was the failure to supply financial justification for the density bonus. As stated by this court in TCR, supra, 102, the "plaintiff is not required to demonstrate a need for these units. The legislature has decided this issue." CT Page 8876
 E.
Reason six states:
 6. There is insufficient usable area on-site for recreational purposes to support the increased density.
The plans call for approximately 3.5 acres, (over twenty-five percent of the total acreage) of open space for recreational use. (Return Items Q, p. 31; QQ). The record shows that a portion of this will be usable open space in the form of hiking trails. (Return Item F, p. 10). There is no evidence on the record that this amount of open space would substantially impair the public's health, safety or welfare.
Additionally, General Statutes 8-25 authorizing open space requirements specifically states "[t]he open space requirements of this section shall not apply . . . if the subdivision is to contain affordable housing." As noted by the applicant, without statutory authorization, the Commission has no power to regulate this area. Finn v. Planning and Zoning Commission, 156 Conn. 540, 545 (1968).
Accordingly, the Commission has failed to meet its burden on this reason.
 F.
Reason seven states:
 7. The retaining walls on the site plan present safety and maintenance problems for the homeowners. Lots with slopes in excess of fifteen percent do not comply with the subdivision regulations and the proposed walls are an unacceptable solution.
The record indicates that due to the slopes present on a portion of this land, certain homes would require retaining walls. The applicant submitted data on the retaining walls (Return Items CC; QQ) and indicated that if the maintenance was a concern, a fund could be established to pay for repair. (Return Item Q, p. 14). While the Commission expressed CT Page 8877 concern over the upkeep of the retaining walls, there is no evidence to support the concern over the failure; nor is there any evidence that the Commissioners had any special expertise in this area. See Feinson v. Conservation Commission,180 Conn. 421, 428 (1980). The staff comments reflected a concern for maintenance and repair as well as certification by a structural engineer. (Return Item K). There was no evidence that this was not or could not be met.
In connection with the slopes over 15%, the record indicates that two (Lot 4-3 — 25% slope; Lot 4-4 — 16% slope) of the thirty lots have a problem. (Return Item QQ, p. 2; Defendant's Brief, p. 10). Neither are designated as affordable lots. The subdivision regulations at Section 53:06 prohibit building lots having an overall grade greater than 15%. (Return Item UU, 53:06).
In Huntington Branch NAACP v. Town of Huntington, supra, the court divided the town's justifications into plan specific and site specific categories. Plan specific justifications would be reviewed in terms of whether certain design modifications could resolve problems (see, General Statutes8-30g(c)(4)). Site specific problems would be reviewed to determine whether they were bona fide and legitimate (see, General Statutes 8-30g(c)(2) and (c)(3)). This court recognizes that the slope issues expressed by the Commission are valid safety concerns. Notwithstanding the burden placed on the Commission by section (c), this court is remanding this specific issue for these two lots for further discussion. The Commission should address whether these safety concerns can be reasonably addressed or whether the two lots are truly unbuildable.
 G.
Reason eight, the last reason, states:
 8. The property is within a watershed and recharge area for potential wells and future water supply. No evidence has been presented to indicate that the development will not be detrimental to future water supply development.
As part of their application, the applicants submitted CT Page 8878 extensive data and testimony on the impact, or lack thereof, of this proposal on the local wellfields. Much of the public hearing time was devoted to discussions between the Commission and the applicants' geologist, Dr. John A. Raabe. The Commission expressed appropriate concern about the potential impact. Dr. Raabe stated, however, in his conclusions that
 Based on the surface water drainage direction, the ground water data examined, and the geometry of the aquifer, I am confident that the activities associated with development and occupation of the Arbor Commons site could have no adverse impact on the water quantity or quality at the Elton Road Wellfield. (Return Item A, p. 5).
There was no other evidence submitted to suggest the contrary. Nor is there any evidence as to any special expertise held by the individual Commissioners. Feinson, supra; Fuller, Land Use Law and Practice, 21.5. Suffice it to say, the Commission cannot sustain its burden on this issue.
 III.
Conclusion
Except as stated above, the nine reasons do not satisfy the requirements of General Statutes 8-30(c). The Commission has not met its burden of proof as these reasons do not clearly outweigh the need for affordable housing. The appeal is sustained and the Commission is ordered to grant the appropriate approvals for all lots except lots 4-3 and 4-4. The Commission and the applicant need to further review these specific lots to determine whether the slope issue is indeed a problem and, if so, whether it can be resolved.
MARSHALL K. BERGER, JUDGE, SUPERIOR COURT